SAMUEL P. SHAW *vs.* AARON W. SPENCER & others.

A certificate of stock, expressed on its face to be "transferable only on the books of the company by the holder thereof in person, or by a conveyance in writing, recorded on said books, and surrender of this certificate," and transferred in blank upon its back, is not a negotiable instrument.

One holding stock as trustee has *primâ facie* no right to pledge it to secure his own debt growing out of a transaction independent of the trust.

If a certificate of stock expressed in the name of "A. B., trustee," is by him pledged to secure his own debt, the pledgee is by the terms of the certificate put on inquiry as to the character and limitations of the trust, and, if he accepts the pledge without inquiry, does so at his peril.

If a certificate of stock in a corporation, expressed in the name of "A. B., trustee," is by him fraudulently pledged for his own debt, and accepted without inquiry; and the pledgee, after receiving notice of the fraud and a demand of the parties beneficially interested under the trust that the stock shall be held subject to their direction, voluntarily pays an assessment due on the stock, to one of them, as treasurer of the corporation, in the presence of the other; such payment does not estop them from maintaining their claim to the stock.

BILL IN EQUITY against Spencer, Vila & Co. and Mellen, Ward & Co., two firms of brokers in Boston, and the Calumet Mining Company, a corporation under the law of Michigan, praying for an injunction to restrain Spencer, Vila & Co. from making any sale or transfer of two thousand shares of the stock of that company, or of the certificates of the same, and the company from recognizing the validity of any such sale or transfer otherwise than to the plaintiff.

A temporary injunction was granted, and at the hearing, before *Wells*, J., the material facts appeared as follows: On the 28th of February 1867, Spencer, Vila & Co. received from New York United States bonds to the amount of a hundred thousand dollars, with a draft for one hundred and six thousand seven hundred and thirty-five dollars on Mellen, Ward & Co., to whom they were to deliver the bonds on payment of the draft. Charles Mellen applied for and obtained the bonds, promising to return with currency or a cashier's check, which he did not do. Mr. Vila, after calling once or twice unsuccessfully at the office of Mellen, Ward & Co. for the money, at last saw Mellen, who offered his check for the whole amount, which was refused. Mellen then offered a check of Kidder, Peabody & Co. for fifty thousand dol-

lars, and the check of Mellen, Ward & Co. for the balance with collateral security, this latter check to go into the bank the next day. This proposal was accepted, and, just before two o'clock, (the hour of the closing of the Boston banks,) the collateral security was delivered to Spencer, Vila & Co., and the check was deposited. This collateral security consisted of two certificates, for one thousand shares each of stock in the Calumet Mining Company, standing in the name of " E. Carter, trustee," with a transfer in blank on the back of each, subscribed " Edward Carter, trustee," (Carter being a member of the firm of Mellen, Ward & Co.,) and the certificates were expressed to be " transferable only on the books of the company, by the holder thereof in person, or by a conveyance in writing, recorded in said books, and surrender of this certificate," and were dated February 7. The blank transfers were dated February 8. The shares which these certificates represented had been owned by Quincy A. Shaw, and were part of a larger number which he had transferred to certain trustees, including himself and the plaintiff, to secure certain debts, and which these trustees afterwards transferred to the plaintiff. And they had been transferred by the plaintiff into the name of " E. Carter, trustee," as collateral security for certain acceptances made by Quincy A. Shaw on drafts of the Huron Mining Company which had been taken by Mellen, Ward & Co. for negotiation, who gave for them the following receipt :

" Boston, February 8, 1867. Received of S. P. Shaw two certificates of stock in the Calumet Mining Company of Michigan, being for two thousand shares in all, each certificate being of one thousand shares, to be used as collateral for acceptances of Q. A. Shaw of Huron Mining Company drafts, which we bind ourselves to return to said S. P. Shaw whenever said acceptances are paid. Said certificates are in the name of E. Carter, trustee. Mellen, Ward & Co."

There was nothing on the books of the company to show the arrangement with Carter, or the extent or nature of the trust. On the 28th of February nothing was due to Mellen, Ward & Co. on these acceptances. On March 1, Mellen, Ward & Co.

failed; and their check which Mellen gave to Spencer, Vila & Co. was dishonored, and never paid. On that day Mr Farley, a member of the firm of Spencer, Vila & Co., filled the blanks in the transfers of the certificates with the name of that firm, and presented them to Quincy A. Shaw as transfer agent of the Calumet Mining Company, with a request for the transfer to be made and new certificates to be issued in the name of the firm, which was at first declined by Mr. Q. A. Shaw on the ground that he wished to make some inquiries, and afterwards on the ground that an assessment of five dollars per share which had been made on the capital stock was due and unpaid on the shares in question. The next day Mr. Q. A. Shaw heard that Spencer, Vila & Co. held the stock as security for a debt of Mellen, Ward & Co., and not as collateral for Huron Mining Company paper, and addressed to them the following notice :

"Boston, March 2, 1867. Messrs. Spencer, Vila & Co.: Please to take notice that the certificates of stock of the Calumet Mining Company in your hands, and in the name of E. Carter, trustee, are my property, and that I have never received value thereon. Please hold them subject to my direction. Yours respectfully, Quincy A. Shaw, for self and others, trustees."

During the few days following, Mr. Q. A. Shaw had several conversations with Mr. Vila, in which he proposed to submit the question of the title to the stock to certain arbitrators, which proposition Mr. Vila declined. About this time the plaintiff became president, and Mr. Q. A. Shaw treasurer, of the Calumet Mining Company; and on March 18, at the office of the company, Mr. Vila paid the assessment due on the shares in question, to the treasurer, in the presence of the plaintiff, who made no demand for the stock on that occasion. The next day, Mr. Q. A. Shaw returned the amount of this payment to Spencer, Vila & Co. in a letter subscribed like his former letter above recited, and stating that "the assessment was paid and received by mistake," and that the stock was owned by himself; but they refused to receive the amount thus returned. On March 26, the plaintiff served notice on the firm that the stock was his property, and requested them to deliver to him the certificates with such in

dorsements as would enable him to obtain it; and on the same day filed this bill.

The defendants offered testimony to show: " 1. That it is usual with dealers in the stock market to deliver, by way of sales or pledge, certificates of stock, with a blank transfer upon the back; 2. that it is usual for holders of certificates of stock, transferred in blank, to fill them up by inserting the name of some person as transferee or purchaser ; 3. that it is a matter of common occurrence for certificates of stock to be issued in the name of some other person as trustee, when in fact there is not any trust; 4. whether certificates of stock, issued to a designated person as trustee, are constantly bought and sold in the stock market, by a simple indorsement of the certificate by the person named as the holder, without inquiry as to the authority by which, or to the use or purpose for which, the transfer was made." But the judge ruled that, " as to the first two propositions, the facts proposed to be shown were immaterial; and, as to the last two, by the rules of law they were inadmissible."

The defendants alleged exceptions; and the judge reported the case for decision thereon, and for such final decree or other order as in the opinion of the full court should be made.

*S. Bartlett & F. Bartlett*, for the plaintiff.

*B. R. Curtis & C. B. Goodrich*, (*J. M. Keith* with them,) for the defendants. 1. The doctrine of constructive notice has been carried so far in England that eminent judges have expressed apprehension of its danger and a determination not to extend its application. Lord Cottenham, in *Jones* v. *Smith*, 1 Phil. Ch. 253. Lord Cranworth, in *Ware* v. *Lord Egmont*, 4 De G., Macn. & Gord. 460. But this court has uniformly applied the doctrine with great caution. See *McMechan* v. *Griffing*, 3 Pick. 149; *Buttrick* v. *Holden*, 13 Met. 355; *Ashton* v. *Atlantic Bank*, 3 Allen, 219.

2. Whether the court will impute constructive notice in any particular case depends on its own peculiar facts and circumstances, and not merely upon any abstract rules. 2 Sugden on Vendors, (7th Am. ed.) 1041 Dewey, J., 3 Allen, 222. That notice of a fact which makes it the duty of a party to make a

particular inquiry is notice of what he would have learned by that inquiry, may be correct as a general proposition, but conducts only a short distance towards the solution of any particular case. It raises in each case the question, whether upon all its peculiar facts and circumstances it was the duty of the party to make inquiry; and affords no measure of the degree of diligence required by that duty, or the degree of negligence which amounts to a violation of it. In England gross negligence alone is a violation of this duty to inquire. *Jones* v. *Smith,* 1 Phil. Ch. 256, 257. *Ware* v. *Egmont,* 4 De G., Macn. & Gord. 460. Whether such negligence is to be imputed to a party is a question of fact; *Storer* v. *Gowen,* 18 Maine, 177; Story on Bailments, § 11, and cases there cited; and is to be decided by taking into view every material circumstance. If a settled course and usage of business, according to which men in general act, applies to the case, it is one of its most material circumstances, and may even have a controlling effect.

3. If the fact of which the party has notice may or may not affect the validity of the title he is about to take, and it depends upon other extrinsic facts whether it does affect the validity of the proposed title, and the circumstances of the particular case are such that it is not gross negligence for him to act on the assumption that the fact of which he has notice does not affect the validity of the proposed title, and, acting on this assumption, he purchases that title, he is, in the sense of equity law, a *bonâ fide* purchaser without notice. This necessarily results from the requirement of gross negligence in omitting to inquire; and it is sufficiently supported by the highest authorities. 2 Sugden on Vendors, (7th Am. ed.) 1059, and cases cited. Lord Eldon, in *Attorney General* v. *Backhouse,* 17 Ves. 293. *Boyce's Executors* v. *Grundy,* 3 Pet. 210. *Buttrick* v. *Holden,* 13 Met. 355. *Calais Steamboat Co.* v. *Van Pelt,* 2 Black, 377. *Frazer* v. *Western,* 1 Barb. Ch. 220.

4. The facts of which the defendants had notice were, that Carter had, at some time, apparently held this stock upon some trust, for some person or persons; and that, in the usual way, by a blank indorsement, he had transferred it to Mellen, or to his

**firm,** or to some one else who had transferred it to Mellen or his firm. This transfer by Carter might or might not be a fraudulent breach of trust. If the trust was for his firm, and he transferred it to them; if it was a trust to sell, and he had sold it, either to his firm, or any third person from whom Mellen acquired it; or if it was a trust which permitted him to use it as collateral security ; then there was no fraudulent breach of trust. Under all the circumstances, was it gross negligence for the defendants to act on the assumption that there had been no fraudulent breach of trust? The course of business is most material. Can that be gross negligence, which men of common prudence do every day of their lives ? Was it gross negligence for the defendants to make the presumption which the law makes, that there was no fraudulent breach of trust? Angell & Ames on Corporations, § 574. *Frazer* v. *Western*, 1 Barb. Ch. 220. *Ashton* v. *Atlantic Bank*, 3 Allen, 219. If Carter had said there was a trust, but that he was authorized to sell or pledge, the case would be exactly within *Buttrick* v. *Holden*, and *Calais Steamboat Co.* v. *Van Pelt.* Was it gross negligence to trust to his act in indorsing and delivering the certificate, but not so if they had trusted to his bare assertion ? And of whom should the defendants have made inquiry ? The certificate itself showed them, as the fact was, that all they could learn by going to the records of the corporation was, that Carter appeared to be trustee for somebody for some purpose. Was it gross negligence not to inquire of Carter if he had committed a fraudulent breach of trust by indorsing the certificate ? And who can say what information would thus have been obtained ?

5. The plaintiff enabled Carter to deceive the defendants by vesting in him the legal title and entire apparent control over the stock, without any accessible information as to what, or in whose favor, the trust was; the only limitation of Carter's authority, or that of his firm, being in the receipt which was known only to the plaintiff and his brother, and Carter; and in such a' case there should be no remedy. *Calais Steamboat Co.* v. *Van Pelt*, 2 Black, 372.

6. Further, the plaintiff stood by, while the other Mr. Shaw

the *cestui que trust*, treated the defendants as owners of the stock and received $10,000 from them because they were the owners and entitled to a transfer.    Upon no other possible ground could the money have been received; and after receiving it the Messrs. Shaw could not, by a tender of it back, or in any other way, reinstate themselves in such a position as to take from the defendants that which they themselves had so affirmed to be the defendants' property.

FOSTER, J.    The court have bestowed upon this case a degree of attention commensurate with the importance of the principles on which its decision must depend and the magnitude of the amount involved.    One of two innocent parties must bear a heavy loss, caused by the gross fraud of a third person.

Under the circumstances disclosed by the evidence, it was a flagrant breach of trust and a criminal fraud to transfer the certificates of stock to Spencer, Vila & Co.    They were the property of the plaintiff, who is entitled to reclaim them from any one but a *bonâ fide* holder for value without notice.    Charles Mellen, a member of the firm of Mellen, Ward & Co., as collateral security for a debt due from that firm to Spencer, Vila & Co., handed to them two certificates of stock in the Calumet Mining Company for one thousand shares each, standing in the name of another member of that firm, namely, " E. Carter, trustee," and by him transferred in blank.    Spencer, Vila & Co. received the certificates thus indorsed in blank with the name of E. Carter, trustee, for a valuable and adequate consideration without other notice of any defect in title than such as the law may impute from the word " trustee " in the body of the certificates and after the signature of Carter upon the blank transfers.

It is clear that a certificate of stock transferred in blank is not a negotiable instrument.    *Sewall* v. *Boston Water Power Co.* 4 Allen, 282.    Each of these certificates is expressed on its face to be " transferable only on the books of the company by the holder hereof in person or by a conveyance in writing recorded in said books, and surrender of this certificate."    No commercial usage can give to such an instrument the attributes of negotiability.    However many intermediate hands it may pass

through, whoever would obtain a new certificate in his own name must fill out the blanks, as they were filled in the present instance, so as to derive title to himself directly from the last recorded stockholder, who is the only recognized and legal owner of the shares.

It cannot possibly be material whether the manual delivery of the certificates was by Mellen or by Carter himself.   Unless the word "trustee" may be regarded as mere *descriptio personæ*, and rejected as a nullity, there was plain and actual notice of the existence of a trust of some description.   A trust as to personalty or choses in action need not be expressed in writing, but may be established by parol.   And that the mere use of the word "trustee" in the assignment of a mortgage and note imports the existence of a trust, and gives notice thereof to all into whose hands the instrument comes, has been expressly decided by this court.   *Sturtevant* v. *Jaques*, 14 Allen, 523.   See also *Bancroft* v. *Consen*, 13 Allen, 50, and *Trull* v. *Trull*, Ib. 407.   It is insisted on behalf of the defendants, that, even if there was actual notice of the existence of a trust, there was no notice of its character, and that the trust might have been such as to authorize the transfer which was made by Carter.   But, in our opinion, the simple answer to this position is, that, where one known to be a trustee is found pledging that which is known to be trust property, to secure a debt due from a firm of which he is a member, the act is one *primâ facie* unauthorized and unlawful, and it is the duty of him who takes such security to ascertain whether the trustee has a right to give it.   The appropriation of corporate stock held in trust, as collateral security for the trustee's own debt, or a debt which he owes jointly with others, is a transaction so far beyond the ordinary scope of a trustee's authority and out of the common course of business, as to be in itself a suspicious circumstance, imposing upon the creditor the duty of inquiry.   This would hardly be controverted in a case where the stock was held by " A. B., trustee for C. D." But the effect of the word "trustee," alone, is the same.   It means trustee for some one whose name is not disclosed ; and there is no greater reason for assuming that a trustee is author-

ized to pledge for his own debt the property of an unnamed *cestui que trust* than the property of one whose name is known In either case it is highly improbable that the right to do so exists. The apparent difference between the two springs from the erroneous assumption that the word " trustee" alone has no meaning or legal effect.

Inasmuch as such an act of pledging property is *primâ facie* unlawful, there would be little hardship in imposing on the party who takes the security, not only the duty of inquiry, but the burden of ascertaining the actual facts at his peril. Where a partner assumes to give for his own private debt the note of his firm, the creditor who takes it must show that it was given with the assent of the other partners, because it is an apparent misuse of the name of the firm and *primâ facie* evidence of fraud. *Eastman* v. *Cooper*, 15 Pick. 290. But we need not go to that length in deciding the present case. Notice of the existence of a trust is by all the authorities held to impose the duty of inquiry as to its character and limitations. And whatever is sufficient to put a person of ordinary prudence upon inquiry is constructive notice of everything to which that inquiry might have led.

The objection that in the present case the only persons of whom inquiry could have been made were Mellen and Carter, who committed the breach of trust, is sufficiently answered by the words of Sir John Romilly, master of the rolls, in a recent and leading case. " With respect to the argument that it was unnecessary to make any inquiry, because it must have led to no results," he says : " I think it impossible to admit the validity of this excuse. I concur in the doctrine of *Jones* v. *Smith*, 1 Hare, 55, that a false answer, or a reasonable answer, given to an inquiry made, may dispense with the necessity of further inquiry ; but I think it impossible beforehand to come to the conclusion that a false answer would have been given which would have precluded the necessity of further inquiry. A more dangerous doctrine could not be laid down, nor one involving a more unsatisfactory inquiry, namely, a hypothetical inquiry as to what A. would have said if B. had said something other than what he did say." *Jones* v. *Williams*, 24 Beav. 62. These remarks also

explain the cases, cited by the defendants, of *Buttrick* v. *Holden*, 13 Met. 355, and *Calais Steamboat Co.* v. *Van Pelt*, 2 Black, 377. In each of these cases the party did make inquiry, and relied upon the answers received, which were of a character calculated to put him off his guard.

If it be asked of whom the defendants could have inquired as to the meaning of the words " E. Carter, trustee," the nature of the trust thereby indicated, and the existence of the power to pledge for the debts of the firm of Mellen, Ward & Co., which Carter was assuming to exercise, the answer is, that the inquiry could have been made of Mellen, and if he replied that he did not know the nature of the trust, then the duty of the defendants would have been to ask Carter himself for an explanation, which it certainly was in his power to give. It is not to be assumed that false answers would have been made, and the defendants have been thereby deceived and misled. On the contrary, the probabilities are that such an investigation would have led to the discovery of the truth. Or if Spencer, Vila & Co., before taking the stock certificates as collateral security, had been prudent enough to require a transfer to be made to them on the books of the corporation, this step would have brought them into contact with Quincy A. Shaw, and have exposed the whole attempted fraud. Some of the cases say that constructive notice is imputed only on the ground of gross negligence. But, if it be so, a court of equity must hold it to be a want of ordinary prudence, or *crassa negligentia*, to omit all inquiry, where there is actual notice that a trust of some kind exists, and the use proposed to be made of the trust property is *primâ facie* a misappropriation.

The case of *Ashton* v. *Atlantic Bank*, 3 Allen, 217, is not in conflict with these views. It does not proceed on the ground that there was no duty to inquire, but that upon inquiry and examination of the will creating the trust it would have appeared that the trustee might have the right to use the trust funds as he did. He raised money upon the stocks by a discount of his own note with them as collateral; and the court said that it might have been incident to his duties " to discount the trust

funds for the sake of making a permanent investment," or " **the** purchaser might reasonably assume that the money was wanted to discharge liability incurred under the will. Such a case was well warranted by the will creating the trust." In short, the court came to the conclusion that the act of the trustee was in itself lawful in that particular case, and that his fraud consisted only in the misuse of the money when obtained. If this was true, of course the purchaser was not bound to see to the application of the purchase money.

*Hutchins* v. *State Bank,* 12 Met. 421, was the case of a sale of shares of bank stock by an executrix. It is the established rule of equity that " purchases from executors of the personal property of their testator are ordinarily valid, notwithstanding it may be affected with some peculiar trust or equity in the hands of the executor ; for the purchaser cannot be presumed to know that the sale may not be required in order to discharge the debts of the testator, to which they are legally liable before all other claims. But if the purchaser knows that the executor is converting the estate into money for an unlawful purpose, the purchase will be set aside." Smith on Eq. tit. 1, *c.* iv. 10, " Where an executor disposes of or pledges his testator's assets in payment of, or as security for, a debt of his own, the person to whom they are disposed of or pledged will take them subject to the claims of creditors and legatees." *Elliot* v. *Merryman,* 1 Lead. Cas. in Eq. 89. *Hill* v. *Simpson,* 7 Ves. 152. The same doctrine was held by Chancellor Kent in 1823 in *Field* v. *Schieffelin,* 7 Johns. Ch. 150, who, upon a review of all the cases down to the time of that decision, thus sums up the result: " The great difficulty has been to determine how far the purchaser dealt at his peril, when he knew, from the very face of the proceeding, that the executor was applying the assets to his own private purposes as the payment of his own debt. The later and the better doctrine is, that in such a case he does buy at his peril." Chief Justice Gibson, in *Petrie* v. *Clark,* 11 S. & R. 377, expressly announces the doctrine " that an executor's applying the assets in payment of his own debt is of itself a circumstance of suspicion, which ought to put the purchasing creditor upon inquiry as to the propriety of the transaction."

The rule was thus laid down in 1861 in the house of lords : " Where an executor parts with any portion of the assets of the testator under such circumstances as that the purchaser must be reasonably taken to know that they were sold not for the benefit of the estate but for the executor's own benefit, the result is, that the purchaser holds the assets as if he were himself in respect of those assets the executor." *Walker* v. *Taylor*, 4 Law Times, (N. S.) 845. See also 2 Redfield on Wills, *c.* viii. § 32.

The power of disposition over a testator's assets, which an executor has, is as extensive as that of a trustee, and the conversion of the testator's personal estate into money is within the ordinary line of an executor's duty. Consequently the authorities which have been cited as to the liability of those dealing with executors are fully applicable to the case of one who takes trust property from a trustee as security for his private indebtedness.

We proceed to consider the testimony offered by the defendants and excluded by the judge at the hearing.

The fact that it is usual for dealers in stock to take certificates with blank transfers upon them and to fill them up with the names of purchasers, was wholly immaterial. Such a practice, as we have already observed, does not make the shares negotiable, and the purchaser whose name is written into the transfer must always derive his title immediately and solely from the stockholder of record. The point is not made by the plaintiff that a transfer in blank is out of the usual course of business, or a suspicious circumstance ; so that evidence of usage was not requisite to repel such an inference.

The fact that it is common to issue certificates of stock in the name of one as trustee, when no trust actually exists, has no legal bearing on the decision of the present case. The rules of law are presumed to be known by all men ; and they must govern themselves accordingly. The law holds that the insertion of the word " trustee " after the name of a stockholder does indicate and give notice of a trust. No one is at liberty to disregard such notice and to abstain from inquiry for the reason

that a trust is frequently simulated or pretended when it really does not exist. The whole force of this offer of evidence is ad-dressed to the question whether the word " trustee " alone has any significance and does amount to notice of the existence of a trust. But this has been heretofore decided, and is no longer an open question in this Commonwealth. *Sturtevant* v. *Jaques,* 14 Allen, 523.

The circumstance that stock certificates issued in the name of one as trustee, and by him transferred in blank, are constantly bought and sold in the market without inquiry, is likewise una-vailing. A usage to disregard one's legal duty, to be ignorant of a rule of law, and to act as if it did not exist, can have no standing in the courts.

It is to be borne in mind that the question under discussion is not whether one holding stock as trustee may sell it in the market and pass a good title to the purchaser. We do not inti-mate that this cannot be done. The distinction between a sale and a pledge of trust property is palpable and manifest. Nor is the present question whether a trustee may borrow money on the pledge of stock held in trust. We do not decide that such a transaction may not under some circumstances be sustained. These questions are left to be adjudged when they arise. The point now decided is, that one holding stock as trustee has *primâ facie* no right to pledge it to secure his own debt grow-ing out of an independent transaction ; and that whoever takes it as security for such a debt, without inquiry, does so at his peril. All the proffers of evidence taken together fall short of showing any usage to do this; and no evidence of usage could legalize such conduct. Because Spencer, Vila & Co. took these certificates of stock to secure an antecedent debt from Mellen, Ward & Co. to them, with notice that they were held in trust, and made no inquiry as to Carter's authority to use trust prop-erty for such a purpose, they cannot retain the security against the equitable owner of the stock, when it appears that Carter in making the pledge was guilty of a fraudulent breach of trust.

The remaining questions relate to the effect of the payment on the 18th of March of the assessment of ten thousand dollars

**on** this stock by Spencer, Vila & Co. to Q. A. Shaw, treasurer and transfer agent, in the presence of S. P. Shaw, the plaintiff. On the 2d of March, Spencer, Vila & Co. had received written notice from Q. A. Shaw that Carter had no right to transfer the stock to them, and that their title to it was contested. By receiving the money, which Spencer, Vila & Co. voluntarily offered to pay, the Messrs. Shaw did not induce them to change their position, or deprive them of any rights. They had taken the stock certificates nineteen days before they made the payment, and, when it was made, they had no reason to believe that either S. P. Shaw or Q. A. Shaw intended to abandon their claim, or to waive any of their rights. Q. A. Shaw could not have done so by any act of his own. S. P. Shaw did no act, and only omitted to object to the payment of the assessment. The payment was evidently the voluntary act of Spencer, Vila & Co. intended to fortify their own position, and to entitle them to a new certificate of the stock if their title should prove good. It was made for their own benefit and protection, and no act or declaration of the Messrs. Shaw deceived or misled, or induced them to make it. A waiver is an intentional relinquishment of a known right. An estoppel of the description relied on in this case can be maintained only on the ground that, by the fault of one party, another has been induced innocently and ignorantly to change his position for the worse, in such a manner that it would operate as a virtual fraud upon him to allow the party by whom he has been misled to assert the right in controversy. These simple definitions of the terms " waiver" and " estoppel" exclude the possibility of applying either doctrine to the effect of the payment of this assessment.

The amount paid, with interest, must be refunded before any decree can be made requiring the defendants to retransfer the certificates to the plaintiff. As the bill contains no special prayer for this relief, and no offer to refund the money, it will require amendment before such a decree can be entered. But the injunction heretofore granted is made perpetual.