WILLIAM K. GASTON and others

*v.*

THE AMERICAN EXCHANGE NATIONAL BANK and others.

1. One who lends money on the pledge of stock held in trust, will be held to have had notice that the trustee was abusing his trust and applying the money lent to his own purposes, when the certificates of the stock pledged show on their face that the stock is held in trust (though the name of the *cestui que trust* does not appear), and when the loan was apparently for the private purposes of the borrower, and that fact would have been revealed by inquiry.

2. When the certificate of stock on its face reveals a trust, the duty of inquiry is devolved on one who lends money on the pledge thereof.

3. Notice to the cashier of a bank lending on trust stocks, that the stock pledged is held in trust, is notice to the bank.

Bill for relief.  On final hearing on pleadings and proofs.

*Mr. H. M. Gaston,* for complainant.

*Mr. T. N. McCarter,* for defendant.

THE CHANCELLOR.

The bill is filed by William K. Gaston and his wife and children, against William G. Steele, trustee, and the American Exchange National Bank, E. Wilson, cashier of that bank, and the Camden and Amboy Railroad and Transportation and Delaware and Raritan Canal Companies.  The

controversy is in reference to certain shares of the joint capital stock of those companies, (twenty shares of the stock of the former, and one hundred of the latter company,) which, on the 9th of January, 1868, were in the possession of and held by William G. Steele, as trustee for the complainants. On that day he borrowed of the American Exchange National Bank $12,000, and delivered to it the certificates of the stock in question, as collateral security for the repayment of the loan. At the same time he executed and delivered to the bank a letter of attorney, signed by him as trustee, authorizing its cashier to transfer the stock. There were four certificates, for one hundred, eight, seven and five shares, respectively. That for one hundred shares was in favor of James Campbell, trustee for William K. Gaston; that for eight, in the name of Henry Carbell, trustee; that for seven, in the name of Dr. Henry H. Longstreet, and that for five, in the name of Richard Shippen, agent. Each of them was endorsed, "Transferred to William G. Steele, trustee, on the books of the company;" and these certificates of transfer were duly signed by the transfer agent in each case, except in that of the certificate for one hundred shares, the certificate of transfer on which was not signed. In point of fact, the stock mentioned in that certificate had never been transferred on the books of the company to Mr. Steele, but stood in the name of James Campbell, trustee for William K. Gaston. The rest of the stock had been transferred on the books of the company. James Campbell, who was the immediate predecessor of Mr. Steele in the trust, was dead, and his executrix had assigned the one hundred shares of stock to Mr. Steele, as trustee for the complainants, by an assignment which provided that there should be written on the certificate or certificates which should be taken from the company by Mr. Steele for the shares, a statement that the shares were not transferable except by order of the chancellor of this state. After the loan was made by the bank to Mr. Steele, the certificates, with the letter of attorney above mentioned, authorizing the

cashier of the bank to transfer the shares, was sent to the office of the companies at Princeton, in order that the shares might be transferred to the cashier on the books of the companies. The transfer was prevented by injunction in this cause.

Though the answer of the bank alleges that on the making of the loan of $12,000 to Steele, and on the making of former loans by the bank to him on the security of the same shares, he represented to the bank, and assured it and its president and cashier, that he was fully authorized by the trust under which he held the shares to raise money on a pledge or sale thereof from time to time as the purposes of the trust might require, and that the money which he was borrowing from the bank was needed by him, and was about to be used by him for the purposes of the trust, it appears from the testimony of the assistant cashier, Clark, who was sworn as a witness in behalf of the bank, that there was no representation or statement whatever of that kind made by him to the bank, or any of its officers, when the loan of $12,000 was made, and there is no proof that those or any such representations were made by him at any time.

Clark testifies, speaking of the loan of $12,000, that Mr. Steele came to the bank and requested a loan from the bank of $12,000; that he made the request of Mr. Wilson, the cashier, offering him the certificates of the one hundred and twenty shares of stock, and that the loan was made to him, and the amount passed to his credit in the bank. He further says that they (the bank) supposed that the transaction was perfectly regular. He adds, that he had no conversation with Steele on his power to pledge the stock. No attempt whatever is made to sustain the statement of the answer in respect to the alleged representations of Steele at the time of making loans on the pledge of the stock. On the other hand, the evidence is that the transaction was, and was understood to be, on the individual account of Mr. Steele. The cashier's check to him for the money was to his order, and was endorsed by him in his individual

capacity.   The money for it went to his individual account (he had no account as trustee) in the bank, and it was drawn out by him in the ordinary course of his own business.   He pledged the stock for his individual debt.   He says he expected to be able to repay the loan, and so to redeem the stock, but his failure in business prevented. The bank was guilty of gross negligence in the transaction. It received from a trustee certificates of stock belonging to the trust estate, with notice that they were trust property, and, therefore, that the trustee was not the beneficial owner of them, in pledge for a loan to the trustee on his individual account.   It made no inquiry, even of the trustee himself, as to his power to pledge the stock.

The certificate for the one hundred shares was in the name of " James Campbell, trustee for William K. Gaston," and the stock still stood in that name on the books of the company.   Although there was endorsed on the certificate a memorandum to the effect that the stock had been transferred on the books of the company to W. G. Steele, trustee, it was evident from inspection that the memorandum was not official, and did not purport to be so, and was entitled to no credit.   It was not signed, but the place for the signature of the transfer agent was blank.   Upon its face the certificate declared that the shares were transferable on the books of the company only by James Campbell, trustee, for William K. Gaston, or his legal representatives. The bank did not require Mr. Steele to produce even the evidence of his legal title to that stock.   The other shares stood in the name of Mr. Steele on the books of the company, but it was as trustee.   Had the bank made inquiry as to his title and his power over the stock, it would have found that by the order by which he was appointed it was ordered that the certificates of the stock held by him in trust, of which the one hundred shares held by James Campbell, at his death, were part, should be endorsed by Mr. Steele with these words: " This stock is not to be transferred without an order of the chancellor of New Jer-

scy." It would have found, also, that the trust on which he held the stock was to collect and pay the dividends to William K. Gaston for his life, and at his death to divide the stock among his children in equal shares; or, if he should leave no children, then among his brothers and sisters surviving him, in equal shares. The fact that the word "trustee" was written after the name of Mr. Steele, was sufficient notice to the bank of the existence of a trust. *Sturtevant* v. *Jaques*, 14 *Allen* 523; *Shaw* v. *Spencer*, 100 *Mass.* 382. It was notice to it that Mr. Steele was not the beneficial owner of the stock, and therefore was not at liberty to dispose of it for his own benefit, or to pledge it as security for his own debt.

Said the court, in *Shaw* v. *Spencer*, 100 *Mass.* 382, 389: "Where one known to be a trustee is found pledging that which is known to be trust property to secure a debt due from a firm of which he is a member, the act is one *prima facie* unauthorized and unlawful, and it is the duty of him who takes such security to ascertain whether the trustee has the right to give it. The appropriation of corporate stock held in trust as collateral for the trustee's own debts, or a debt which he owes jointly with others, is a transaction so far beyond the ordinary scope of a trustee's authority, and out of the common course of business, as to be in itself a suspicious circumstance, imposing upon the creditor the duty of inquiry. This would hardly be controverted in a case where the stock was held by A B, trustee for C D. But the effect of the word 'trustee' alone is the same. It means trustee for some one whose name is not disclosed; and there is no greater reason for assuming that a trustee is authorized to pledge for his own debts the property of an unnamed *cestui que trust*, than the property of one whose name is known; in either case it is highly improbable that the right exists."

The cases in reference to pledges by executors and administrators are not in point. The distinction between sales of stock by executors and administrators, and such sales by

trustees, is adverted to in *Prall* v. *Tilt*, 1 *Stew.* 479.   A sale
and transfer by the former is ordinarily in the line of their
duty.    On the other hand, the common duty of a trustee is
not administration or sale, but custody and management for
his *cestui que trust.*

The case of *Duncan* v. *Jaudon*, 15 *Wall.* 165, is exactly in
point.    There the trustee held shares of the Delaware and
Raritan Canal Company as trustee for Mrs. Mary T. B. Jau-
don, as appeared on the face of the certificates.   He pledged
them with Duncan, Sherman & Co., as security for a loan for
his individual benefit.   Said the court: "The loans were
for no purpose connected with the trust, but for Jaudon's
(the trustee's) own benefit, and the face of the papers given
as collateral security for the debts thus incurred informed
the parties dealing with him that he held the stock as
trustee for Mrs. Mary T. B. Jaudon, and inquiry would
have revealed the fact that the use to which the stock was
put was unauthorized.   The duty of making such inquiry
was imposed on these parties, for it is out of the common
course of business to take corporate stock held in trust as
security for the trustee's own debt.   The party taking
such stock on pledge deals with it at his peril, for there
is no presumption of a right to sell it, as there is in the case
of an executor.   In the former case the property is held for
custody, in the latter for administration."

Steele is insolvent.   In this case one of two innocent par-
ties must suffer, the bank or the *cestuis que trust,* and it is
but just that the loss should fall on the former, which might,
by the exercise of reasonable care, have protected itself.   In
such cases reasonable care is a duty.   The trustee proposed
to borrow money on his individual account for his own use,
and to secure the repayment of it by the pledge of stock,
which on its face bore evidence that it was not his own, but
the property of some one else, for whom he held it in a
fiduciary capacity, and that he had no right to pledge it for
his own debt.   The bank, without a question even to him,
so far as appears, as to his right so to pledge the stock, and

without any inquiry whatever on the subject, lent him the money and accepted the security. One hundred shares of the stock still stood on the books of the company in the name of the trustee's immediate predecessor in the trust. As to all of the stock, the fact that it was held in trust was known to the bank. It was not misled by any statement or representation. It chose to assume that inquiry was unnecessary and to rely on the character of the trustee as a guaranty for the lawfulness of the transaction and the propriety of his conduct in dealing with the trust property. The loss should, as before remarked, in equity fall on it rather than on the *cestuis que trust*. There will be a decree in accordance with these views.