On January 26th, 1913, Isidor Kaufman died leaving a last will and testament, which was probated before the surrogate of Hudson county on July 18th, 1913. He appointed Henry Goldman and Charles H. Blohm as his executors and trustees. Blohm qualified as executor and Goldman renounced. The estate was administered by Blohm until his death on May 11th, 1939 (Exhibit C-31). After his death, the complainant was substituted as administrator cumtestamento annexo. The complainant upon qualifying as administrator discovered that the assets of the estate had been embezzled and misappropriated by Blohm. *Page 603 
Blohm, as executor, opened an account with the defendant trust company, which he maintained until October 7th, 1938, when he closed it out by his check in the sum of $32.20 drawn to his personal order. With the exception of the first few years, the account was inactive except that monthly checks were drawn thereon to the order of the widow of the decedent, Antoinette Kaufman, the life tenant, which appear to have been covered by monthly deposits in similar amounts.
The bill alleges that the defendant trust company made loans to Blohm as executor, and as security therefor took stock belonging to the estate which it subsequently sold and applied the proceeds thereof against the loans. It is averred that Blohm as executor had no power to borrow money and to offer the estate's stock as security and that the bank had notice of that fact. It charges that upon the date the loans were made, checks were drawn on the estate account to the order of Blohm personally, which went through his account. It contends that in loaning moneys to Blohm as executor, and accepting as security therefor the estate's assets, the defendant thereby aided and assisted "in the dissipation or embezzlement by Blohm of the funds of the estate."
An accounting is sought from the defendant and particularly for the "trust funds paid out by it upon checks of said Blohm as executor, to his own order or use." The prayer of the bill asks for a decree to the effect "that said trust funds disbursed by said defendant were in fact misappropriated and embezzled by said Blohm, and that said defendant is chargeable with liability therefor because of its complicity in the transactions."
The defendant admits that in addition to the estate account, Blohm had a personal account in its bank; and that he had been indebted to it on his own account. It admits the sale of the estate's stock consisting of 100 shares of General Cigar Company stock; 100 shares of Underwood, Elliott Fisher Company stock; and 100 shares of B.F. Goodrich Company stock, and out of the proceeds thereof, the payment of its claim of $12,000 for loans made to Blohm as executor, and with crediting the proceeds remaining therefrom to the account of Blohm as executor. (SeeExhibits C-3, C-4 and C-5.) *Page 604 
The first two above mentioned stocks were put up by Blohm as executor as collateral for a demand loan.
The stock certificates were made out to "Charles H. Blohm, as executor of Estate of Isidor Kaufman," and were endorsed by him as executor or trustee, or both.
James P. Kennedy, manager of Goodbody Co., a stock brokerage concern, testified in substance; that on January 13th, 1936, he received an order from the defendant to sell the 100 shares of General Cigar stock at the market price. That he sold the same on January 18th, 1936; and on January 21st, 1936, he gave the defendant a check for $14,075.71, which represented the proceeds of the sale of this stock, less broker's commission and government tax. That on January 30th, 1936, he received an order by telephone from the defendant to sell the 100 shares of Underwood, Elliott Fisher stock, which he sold and remitted the proceeds to the defendant, to wit: February 24th, 1936, sold ten shares at $133; February 1st, 1936, sold twenty shares at $133; January 30th, 1936, sold sixty shares at $133, and March 27th, 1936, sold ten shares at $133. That on July 14th, 1936, he received a telephone order from the defendant to sell 100 shares of B.F. Goodrich stock at ninety-seven and three-quarters which he sold on that day, and on July 26th, 1936, remitted the proceeds to the defendant.
The bank made demand collateral loans to the estate of Isidor Kaufman, Charles H. Blohm executor (Exhibit C-7), as follows: December 26th, 1935, $4,000; January 2d 1936, $3,000; January 13th, 1936, $3,000; the collateral pledged was the 100 shares of Underwood stock and 100 shares of General Cigar stock. The estate account shows the deposit of these loans. The withdrawals of these moneys from the estate account were made by Blohm as executor on, or about, the same days the deposits in the estate account were made, and were deposited in his attorney's account in the bank as follows: December 26th, 1935, $4,000; January 3d 1936, $3,000; January 13th, 1936, $3,000; January 14th, 1936, $2,000 (Exhibits C-6, C-8, C-9 and C-10). The records of the bank show the receipt by the bank on January 22d 1936, of a check for $14,075.71, the proceeds of the sale of the *Page 605 
General Cigar Company stock. Out of that sum the bank on the same day deducted the amount due it on the collateral loans aggregating $12,000 and interest; and the balance of $2,039.71 it credited to the estate account. The estate account shows a withdrawal on January 31st, 1936, of $2,000 by check signed by Blohm as executor to him personally and deposited in his attorney's account (Exhibit C-11).
William F. Fanning, an officer of the bank, testified that he knew the estate account was in the bank; that he made the original loan to Blohm and that he knew that Blohm, when he applied for the collateral loans, then was indebted to the bank in the sum of approximately $70,000. He said that when Blohm made the application he explained that he needed the money for the purpose of making repairs to the estate's properties. The witness said he examined the decedent's will and that it indicated that Blohm as executor had authority to obtain the loan. He admitted that when the application was made by Blohm he was not aware that the estate was seized of any real property, and that he did not inquire of Blohm the character or place of the property involved, nor what repairs were to be made. He simply took Blohm's word as to the bona fides of the transaction and made no further investigation other than that, in effect, above mentioned. Some of the loans to Blohm were approved by W.R.D. Andrew, who was a vice-president of the defendant trust company. Fanning admitted that he was chiefly interested in seeing that the collateral, offered by Blohm as security for the loan, was sufficient to protect the bank.
In the course of his examination Fanning was asked to point out the clause of the will from which he decided that Blohm as executor was given authority to borrow money. He pointed to subdivision (a) of the fourth paragraph, and to the sixteenth paragraph of the will. Clause (a) of the fourth paragraph reads as follows:
"(a) To invest, re-invest and keep the same invested in mortgages on real estate in the States of New Jersey and New York, in such stock and bonds as my son-in-law, who is one of the executors, may deem to be to the best advantage and to collect the income therefrom and to pay over the net income, to my beloved wife, Antoinette, for *Page 606 
and during the term of her natural life, or until she remarries; said money to be used by her for the maintenance support and education of my four children, namely, Ruth, Mabel, Milton and Percy, besides, for her own support."
The sixteenth paragraph of the will reads as follows:
"Sixteenth: I do give to my executors and trustees hereinafter named, or the survivor of them, full power and authority to grant, bargain, sell, mortgage or convey, any or all of my real estate, to any person or persons, in fee-simple, or otherwise, at public or private sale, at such time, and upon such terms and in such manner, as to them or the survivor of them, shall think fit, and to execute, acknowledge and deliver to the purchaser or purchasers thereof, all necessary papers that may be required of them to perform the same, and the purchaser or purchasers of said real estate, shall not be responsible for any act of commission or omission of any or all of my said executors or the survivor of them."
Hollingsworth v. Lederer, 125 N.J. Eq. 193; 4 Atl. Rep.
2d 300.
The decedent's widow, Antoinette Kaufman, in effect, testified that Blohm gave her monthly checks which he said represented dividends on the Underwood, General Cigar and B.F. Goodrich stocks; that some years ago, or prior to 1933, the amount of the checks was reduced, Blohm telling her that the dividends had become less; and later on, about 1933, they were increased to $127, which amount was paid to her monthly up until one month before Blohm's death.
Blohm had an attorney's account and a special account in the defendant bank. The attorney's account was closed out on November 16th, 1936; his special account was closed out on October 11th, 1935.
I can find nowhere in the will any language which accorded the executor the right to borrow money and pledge the assets of the estate as security therefor. Certainly clause (a) of the fourth paragraph confers no such power. That clause limits the executor's activities to the following: "To invest, re-invest and keep the same invested in mortgages on real estate in the States of New Jersey and New York, in such stock and bonds as my son-in-law, who is one of the executors, may deem to be to the best advantage, and to collect the income therefrom and to pay over the net income, to my beloved wife, Antoinette," *Page 607 c. The sixteenth paragraph of the will does not extend to the executor the power to borrow moneys on promissory notes and pledge stock of the estate as security therefor; that paragraph relates to the executor's power to "mortgage or convey * * * real estate." I do not understand by what process of reasoning Fanning, or any other officer of the defendant trust company could conclude that Blohm was empowered to borrow money from the bank in the circumstances present in the instant case. There is no record of any language in the will which suggests such an inference. Fanning presumably misconstrued the meaning of the paragraphs to which he referred and applied to them a significance which, by any stretch of the imagination, cannot be justified. Having consulted the will to ascertain the extent of Blohm's power, he and the trust company, which he represented, became charged with the information it therein conveyed. Since the testament is silent as to Blohm's ability to borrow, then it must be assumed he had no such power. When the bank read into the will an unwarranted precept which it did not possess, and upon which it acted, whereby a loss resulted, then as between the two innocent interested parties (the bank and the estate), the loss must fall upon the bank — the misguided actor.
If the moneys were to be spent for repairs on the estate's realty, the necessary expenditures should, and could, have been obtained by a loan on bond and mortgage. The will empowered the executor to mortgage the real estate. The act of the bank in making a loan in the face of its representative's knowledge of Blohm's circumscribed authority lends force to the contention of the complainant that it participated in the irregular dealings with the estate's assets, and made possible the embezzlement and defalcation by the executor.
Blohm used his office as executor and trustee to obtain loans from the defendant trust company, which by a "winding route" reached his private account and were evidently applied to his personal use. As security for those loans he gave assets which he held in a representative capacity and did not own. His business relations with the defendant ran over a long period of years. He was well known to the bank. It trusted *Page 608 
him. It had Blohm's personal account in its bank. While the defendant was not exactly charged with policing his deposits and withdrawals, nevertheless, it seemed to close its eyes to dangers that might be incident to Blohm's apparent financial difficulties. It had knowledge of his feeble financial status and was confronted with his heavy indebtedness to it. Its knowledge in that respect also is evidenced, to some extent, by his letter to the president of the bank, dated August 9th, 1935 (ExhibitC-24), which, in effect, is a confession of his financial instability, and a request for a reduction in his interest rates. The 100 shares of B.F. Goodrich stock which the bank ordered Kennedy, the manager of the brokerage firm of Goodbody Co., to sell, was not held by the bank as collateral security for any loan. That act of the bank's, seemingly, was a gratuitous service of friendship to Blohm. It does not appear that it questioned him too deeply as to the purposes of the loans and his right to obtain them. In the transaction it does not seem to have exercised the degree of care, at least ordinary in extent, commensurate with the circumstances and the risk involved. The entire circumstances surrounding Blohm's representative and individual business relations with the defendant certainly were sufficient to put it on inquiry. All the circumstances negate a plea of innocence from the bank.
When one ignores a plain duty to make full and complete inquiry, then in the circumstances it must accept the responsibility and liability its neglect or want of vigilance entails. The law in that respect is clear.
"* * * A trustee having power to invest the trust property according to his best judgment, and to pay over the income from time to time to the beneficiaries, and to change any investment at discretion, has no authority to pledge any part of the trust property as security for the payment of a promissory note made by him as trustee, although the money received goes into the trust fund, and is expended for purposes for which the income could rightfully be appropriated." (26 R.C.L. 1303 § 156.)
In Tuttle v. First National Bank of Greenfield,187 Mass. 533; 73 N.E. Rep. 560; 105 A.S.R. 420, the Supreme Judicial Court of Massachusetts said: *Page 609 
"By the provisions of the will of Horace S. Stebbins, under which the maker of the note was trustee, he was directed and required to invest the property according to his best judgment and discretion, and to pay over the income from time to time as it accrued to the beneficiaries, with full power in his discretion to change investments. But this power did not clothe him with authority to pledge any part of the fund as security for the payment of a promissory note made by him as trustee, although the money thus received went into the trust funds and was expended for purposes for which the income could have been lawfully appropriated. * * *
"At the time of the negotiation of the note the original payees, and subsequently the defendant bank, which held title under their endorsement, had notice by the form of the stock certificate and accompanying power of attorney that the shares were held in trust. They were thus put upon inquiry, and must be held to have known what it was their duty to ascertain — that the trustee had no authority to pledge them as collateral security for an obligation that in law was his individual debt."
To the same effect is the case of Loring v. Brodie,134 Mass. 453, wherein the Supreme Judicial Court of Massachusetts said:
"In any aspect, the evidence appears to us to show that the bank had sufficient notice that the bonds, as well as stocks, were trust funds; and that Brodie as trustee was assuming to pledge them; and thus it was the bank's duty to ascertain whether he had a right so to do. Shaw v. Spencer, 100 Mass. 382;Hayward v. Cain, 110 Mass. 273. Had inquiry been made, and had an examination of the indentures taken place, they would have shown no authority to pledge the bonds or stocks, even if Brodie was undertaking thus to benefit the trust. Such authority could not be derived from the power to sell the property and change the investments which is there found."
Rutherford Land and Improvement Co. v. Sanntrock, 60 N.J. Eq. 471; 46 Atl. Rep. 648; Shipman v. Lord, 58 N.J. Eq. 380;44 Atl. Rep. 215; Prall v. Hamil, 28 N.J. Eq. 66. In the case ofGaston v. American Exchange National Bank, *Page 610 29 N.J. Eq. 98, Chancellor Runyon, among other things, said:
"In this case one of two innocent parties must suffer, the bank or the cestuis que trust, and it is but just that the loss should fall on the former, which might, by the exercise of reasonable care, have protected itself. In such cases reasonable care is a duty. The trustee proposed to borrow money on his individual account for his own use, and to secure the repayment of it by the pledge of stock, which on its face bore evidence that it was not his own, but the property of someone else, for whom he held it in a fiduciary capacity, and that he had no right to pledge it for his own debt. The bank, without a question even to him, so far as appears, as to his right so to pledge the stock, and without any inquiry whatever on the subject, lent him the money and accepted the security. One hundred shares of the stock still stood on the books of the company in the name of the trustee's immediate predecessor in the trust. As to all of the stock, the fact that it was held in trust was known to the bank. It was not misled by any statement or representation. It chose to assume that inquiry was unnecessary and to rely on the character of the trustee as a guaranty for the lawfulness of the transaction and the propriety of his conduct in dealing with the trust property. The loss should, as before remarked, in equity fall on it rather than on the cestuis que trust.
All the circumstances point to the defendant trust company's liability for the loss which the estate sustained. I shall advise a decree accordingly.
 *Page 1