# Cases

# FIRST DEPARTMENT

AT

# GENERAL TERM,

## July, 1875.

---

## THE ERIE RAILWAY COMPANY, APPELLANT, *v.* COR-NELIUS VANDERBILT, RESPONDENT.

*Corporation — liability of persons taking its funds in settlement of controversy with directors individually — Fraudulent use of corporate name by directors — effect of.*

When, for the purpose of settling a contest between the individual directors of a corporation and third persons, the corporation is made to pay the damages occasioned by the fraudulent acts of the directors, the person taking the money, with knowledge thereof, is liable to the corporation for the same.

When actions are brought nominally for the protection of a corporation, but in reality for the purpose of requiring its officers to settle, out of the corporate property, their individual liabilities, it is an abuse of the process of the court, and funds of the corporation paid out by the directors in settlement of such suits may be recovered by it.

A person who has received from a trustee of a corporation the corporate property, with knowledge thereof, in satisfaction of the debt of such trustee to him, cannot defeat an action brought against him by the corporation for the recovery thereof, on the ground that no privity or relation existed between himself and the corporation.

Where trustees use the name of a corporation in matters conducted for their private benefit, with knowledge on the part of him with whom they are dealing, it is no defense to an action brought by the corporation for a fraudulent disposition of its property that it is *in pari delicto*, because its name has been used in committing the fraud.

APPEAL by plaintiff from a judgment entered on the decision of the court dismissing the complaint.

*W. W. Mac Farland* and *Wm. D. Shipman,* for the appellant. Officers of corporations to whom the care and management of the corporate property is by law confided, are trustees of that property, bound by the strictest rules of law to execute their trust literally, intelligently and honestly, and to that end to devote the corporate property to its appropriate and intended uses, and none other. (Perry on Trusts, § 430 ; *Morrett* v. *Paske,* 2 Atk., 52 ; *Powell* v. *Glover,* 3 P. Wms., 251 ; *Great Luxemburg Ry. Co.* v. *Magnay,* 25 Beav., 586 ; *Chaplin* v. *Young,* 33 id., 414 ; *Bowes* v. *Toronto,* 11 Moore P. C. C., 463 ; *Docker* v. *Somes,* 2 M. & K., 665 ; Perry on Trusts, § 207 ; *Butts* v. *Wood,* 37 N. Y., 317 ; *Coleman* v. *Second Avenue Railroad Co.,* 38 id., 201 ; *Bliss* v. *Matteson,* 45 id., 22 ; *European, etc., R. R. Co.* v. *Poor,* 59 Me., 277 ; *Emporium, etc.,* v. *Emrie,* 54 Ill., 345 ; *Aberdeen Rd. Co.* v. *Blaikie,* 1 McQueen, 482 ; *In re Anglo Creek Steam Co.,* L. R. [2 Eq.], 1 ; *In re Madison Bank,* id., 216 ; *Simons* v. *Vulcan Oil Co.,* 61 Penn. St., 202 ; *Hoffman Coal Co.* v. *Cumberland Coal Co.,* 16 Md., 456 ; *Kimmell* v. *Geeting,* 2 Grant's Cases, 125 ; *Bradbury* v. *Barnes,* 19 Cal., 120.) One who receives trust property with either actual or constructive notice of the trust, and with either actual or constructive notice that it is being dealt with contrary to the terms of the trust and in breach thereof, is liable and bound to restore the trust property or its value so wrongfully diverted from it. (Story's Eq., § 1258 ; *Bliss* v. *Matteson,* 45 N. Y., 22 ; *Emporium, etc.,* 54 Ill., 345 ; Story's Eq. Jur., § 1257 ; Perry on Trusts, §§ 825, 855 ; Hill on Trusts, [m. p.] 520 ; *Lowry* v. *Commercial and Farmers' Bank,* Taney's Circuit Ct. Dec., 310 ; *Shaw* v. *Spencer,* 100 Mass., 382.) One who receives trust property as security for, or in satisfaction of, an antecedent debt or obligation due to himself, is not a *bona fide* purchaser thereof, and is liable to refund even without notice of the trust either express or implied. (See the foregoing authorities, and also Perry on Trusts, §§ 217, 272 ; *Bassett* v. *Noseworthy,* 2 Lead. Cas. in Eq., 103, 109 ; Perry on Trusts, §§ 828, 834.) Applying to this case the legal principles above stated, it is now

submitted that the disposition which was made of the money and property of the Erie Railway Company by its officers, was unlawful ; that it was a fraudulent misappropriation thereof, involving a flagrant breach of trust ; that the defendant, Vanderbilt, received the money and bonds with full knowledge of its being the money and stock of the Erie Railway Company, and that it was being misappropriated in breach of trust. Mr. Vanderbilt had no claim against the Erie Railway Company. Not one of those actions was brought for the enforcement of any claim against the company with a view to extract money from the treasury of the company in satisfaction of a claim against it, but every one of them was avowedly brought for the express purpose of protecting the treasury of the company against the alleged fraudulent conduct of the agents and officers of the company. So that this money and stock of the company was not parted with by its officers or received by the defendant in satisfaction of any claim, just or unjust, against the Erie Railway Company. Only a little reflection is required to see that nothing can be more absurd than that the directors of the corporation should be at liberty to employ the funds of the corporation in the purchase of all the stock of the stockholders of the company, or so much thereof as might suit their interests or their fancies. This is a grossly improper use of the funds and diversion of them, even if the act be done in good faith, from the legitimate purposes and objects of the corporation.

*Wm. A. Beach* and *John K. Porter*, for the respondent. Where the parties are not *in pari delicto*, and one, being a corporation, has received money or property from the other, through an executed contract *ultra vires*, that other party may maintain an action for its recovery. (*Tracy* v. *Talmadge*, 14 N. Y., 162, 179 ; *Curtis* v. *Leavitt*, 15 id., 236, 284 ; *Gillett* v. *Philips*, 13 id., 114 ; *Leavit* v. *Palmer*, 3 id., 19 ; reviewed, 15 id., 101.) The assumed trust relation does not exist. The Erie Railway Company is not the trustee of its stockholders. It is the legal owner of its corporate property, empowered to dispose of it absolutely, except as restrained by legislative act. The trust is between it and the State. It is the creature of the State, exerting powers delegated to it by the State. (*Karnes* v. *Rochester R.*, 4 Abb. [N. S.], 107.) The argu-

ment for plaintiff, therefore, fails, for the several reasons: 1. That if the act charged be unlawful, it being fully performed and plaintiff standing *in pari delicto*, has no remedy. 2. That the purchase from defendant was not *ultra vires*, but strictly in performance of plaintiff's legal duty. 3. That the notion of a trust is not applicable. But if so, plaintiff is not the proper sole party, and cannot in its own name remedy its own unlawful act. The action is not maintained upon the ground of fraud. The court below found against the plaintiff upon that issue. Not a single allegation of fraud contained in the complaint is proven, or attempted to be proven. Admitting plaintiff's theory, that the various litigations against it were maintained by defendant to compel it to purchase his stock, there was no fraud. The whole transaction was then a compromise of a doubtful claim, and obligatory, although it should afterward appear that the claim was unfounded. (*Russell* v. *Cook*, 3 Hill, 504.) The law encourages compromises. (*Vosburgh* v. *Teuton*, 32 N. Y., 561.) The corporation had ample power to effect the compromise. They may assign in trust for the benefit of creditors. (*De Ruyter* v. *St. Peter's Church*, 3 Comst., 238; *Hurlburt* v. *Carter*, 21 Barb., 221; *Nelson* v. *Edwards*, 40 id., 279.) And they have power to submit controversies to arbitration. (*Brady* v. *Mayor of Brooklyn*, 1 Barb., 584.) And *a priori* they may compromise and settle contested and doubtful claims. Having the power and exerting it, settlements thus made are final, unless fraudulently procured. And of that there is no pretense. Plaintiff's officers were not deceived. They were fully instructed and acted under the advice of eminent counsel. The settlement was not unequal. Defendant obtained relief from spurious stock at the price he considered it intrinsically worth. He secured but scanty compensation for losses inflicted by the fraudulent and unlawful acts of plaintiff's officers. But whether the compromise was equal or unjust, is entirely immaterial. Plaintiff's officers, guided by skillful counsel, deemed it judicious. It follows, that the transaction between the parties cannot be disunited, and plaintiff recover the $1,000,000 as a distinct payment, separate from the compromise. Plaintiff having received the consideration, there must be complete restitution. (*Bissell* v. *Michigan Southern R. R.*, 22 N. Y., 258, 268; *Parish* v. *Wheeler*,

id., 494, 508; *De Graff* v. *American Linen Thread Co.*, 21 id., 124, 127.) The issue of stock at less than par, through the form of convertible bonds, was invalid and in fraud of the law, and the defendant, as a purchaser of the new stock, had a just claim against the company for the amount paid by him for such stock. (*Sturges* v. *Stetson*, 1 Bissell's (U. S.) R., 246, decided in 1858, by Judge McLean; *Fosdick* v. *Sturges*, 3 Phila. R., 312, decided in 1858, U. S. Circuit Co. [Pa.]; Laws of 1850, 225, § 28, subd. 10.) If it was issued in fraud of law, by the wrong of the company's officers, whether in absolute violation of the charter, or in a case and for purposes unauthorized by statute, the company was liable to the defendant for the amount paid by him on the fraudulent certificates put in circulation and attested by the corporation. (*Bruff* v. *Mali*, 36 N. Y., 200, 205; *Shotwell* v. *Mali*, 38 Barb., 472; *McNeil* v. *Tenth National Bank*, 46 N. Y., 325, 331; *New Haven R. R. Case*, 34 id., 30, seventh and eighth head-notes; *Titus* v. *Great Western Turnpike Co.*, 5 Lans., 250, 255.) " To render valid the compromise of a litigation, it is not necessary that the question in dispute be really doubtful, if the parties *bona fide* consider it to be so." (*In re Midland Railway Co.*, etc., 4 De Gex, McNaughton & Gordon, 356; *Russell* v. *Cook*, 3 Hill, 504, 506, 507.) Nor is it material to the validity of the compromise that a suit should already have been brought to assert the claim. (101 Eng. Com. Law [1 Best & Smith], 559, 569, 570; *Russell* v. *Cook*, 3 Hill, 504, 506.) The plaintiff is not a " moneyed corporation;" and its general authority to purchase its own stock, is established by the judgment of the Court of Appeals, as well as by the antecedent authorities. (1 R. S., 598, § 51; *City Bank of Columbia* v. *Brice*, 17 N. Y., 507.) It has uniformly been held that when the transaction is an isolated one, incidentally occurring in the course of the corporate business, it will not be treated as an act *ultra vires*. (*Steam Navigation Co.* v. *Weed*, 17 Barb., 378, 383; *Potter* v. *Bank of Utica*, 5 Hill, 490; *Suydam* v. *Morris Canal and Banking Co.*, 6 Hill, 217 [Court of Errors]; *Taylor* v. *Chichester Railway*, 4 Hurl. & Colt., 409 [Exch., 1866]; *Home Ins. Co.* v. *North Western Packet Co.*, 32 Iowa, 246; *Augusta* v. *Leadbitter*, 16 Me., 47, 48; *Nelson* v. *Inhabitants of Milford*, 7 Pick., 26, 27.) Even if the transaction had been between the company and the

defendant, and had been *ultra vires,* the company, after its execution and consummation, could not recover back what the defendant received. (*Bissell* v. *Michigan Southern R. R. Co.,* 22 N. Y., 259, and authorities cited at pages 278 and 279; *Life Ins. Co.* v. *Mechanic Ins. Co.,* 7 Wend., 31; *The State of Indiana* v. *Moran,* 6 Hill, 37; *Buffett* v. *Troy and Boston R. R. Co.,* 40 N. Y., 168, 172; *Sackett's Harbor Bank* v. *Lewis Co. Bank,* 11 Barb., 213; *Silver Lake Bank* v. *North,* 4 Johns. Ch., 370; 22 N. Y., 260; id., 260, 290, 308, 309; *Schroeder's Case,* L. R. [11 Eq. Cas.], 140, 141 [1870].) If the plaintiff has been prejudiced by any .unauthorized act of its officers, its remedy is against them, and not against the defendant. (*Verplanck* v. *Mercantile Ins. Co.,* 1 Edw. Ch., 84, 94.)

DONOHUE, J. :

The complaint in this case sets out, in substance, and the facts prove, that in 1868 several suits were brought by parties named against the plaintiff, corporation, and its officers and trustees, for matters alleged in those suits to be frauds on the plaintiff and its stockholders; that the claims made in such suits were for the protection of the plaintiff and its stockholders; no damages were asked against plaintiff herein, and the relief asked was for the benefit of plaintiff; that the defendant was not nominally a party to those suits, and denied any interest in them. The complaint in this case further alleges, in substance, the settlement of those suits, and a payment of money of the plaintiff to defendant, by which plaintiff was defrauded. The complaint offered to rescind all such contracts, and asked that the money and securities be returned to it. The answer substantially denies the connection of the defendant with the suits referred to, or his interest in any of them. He denies any connection or interest in any of these compromises or payments on the part of the present plaintiff.

The substance, in fact, of allegation and denial is, that the plaintiff contends, and defendant denies, that certain suits, brought at the time to compel the performance of justice by certain defaulting officers to the company, were settled by the defendant and his friends by not taking the money from the alleged defaulters, but settling with them by taking more money out of the company

plaintiff to settle stock speculations in which such officers had obtained an advantage over the defendant and his friends.

Neither time nor opportunity has enabled the preparation of an opinion giving minutely the facts at which I have arrived, and on which my conclusion is founded, but the facts, it seems to me, can be summed up in a short space.

. Drew and others were in the control of the Erie Railway Company, as its trustees. The defendant had given an unlimited order to buy that stock. One of the directors of the railroad company acting with Drew, taking advantage of a clause in the charter of the Erie Railroad Company, which allowed the issue of bonds convertible into stock, procured, as the former complaint alleged, fraudulently, the issue of bonds which were converted into stock and used in filling contracts for stock sold defendant. It seems to me at this point proper to say, that the defendant cannot contend such issue was valid, because, if he does so, then there was nothing to settle, as we shall presently see, and the proceedings that resulted in the settlement were, in law, a fraud on plaintiff. The defendant and those acting with him, finding that the contracts under which they had hoped by taking stocks to control the road, were being filled by stock thus issued (the money for the stocks, I shall assume, the plaintiff received), applied to the court to prevent the issue, and obtained an injunction against such issue, and asked for relief against the trustees, and that they account to the present plaintiff. The defendants in those suits violated that injunction and continued to issue the stock. The friends of the defendant, who brought those suits, succeeded in driving the directors of the plaintiff out of the State by the legal proceedings commenced by them for violation of the injunction.

The parties plaintiff in those suits and the defendant had the right, if they saw fit, to hold the present plaintiff, as in the case of the Schuyler frauds ; to attack the issue of the stock and make the railroad company responsible for the act of their agent in so issuing it. But the facts disclosed show that that would not meet the object the then plaintiffs wanted, and the scope of those suits sets up that the directors of the plaintiff had, in fraud of its rights, issued the stock, and they should be compelled to replace the stocks and compensate the defendant and his friends for the loss. Whatever

may be the statement of the parties, the court cannot shut its eyes to the fact that these facts are true. Now, with this direct fair road that those suits on these facts presented to compel the officers of the plaintiff's company to respond for their improper acts, the defendant and his friends chose their own course with them.

The directors charged thus, finding that the only relief they had was in making a settlement with the plaintiffs in those suits, started to make it, and here the wrong exists; those suits in apparent good faith, and which the parties in interest with the present defendant, professing to do what they did for the benefit of plaintiff, and using the process of the court for that purpose, and by which they could and should have compelled a proper settlement with plaintiff, did not do so. Notwithstanding the fact that the wrong to plaintiff was apparent, the real object of the suits by defendant's friends was attained by a settlement, taking the money out of the plaintiff to settle an alleged fraud of the directors, and it is now before the court to say whether the courts of this country will consent to set their seal of approval on such acts. If these are the facts, it seems to me it is high time to have the courts take a stand and condemn such transactions with trust funds and hold all parties to a rigid account.

It is not a question what right the defendant or his associates had against unfaithful agents, but what is just to the stockholders, who are bound to rely on the trustees for justice, and what duty was cast on the defendant and his associates when dealing with these trustees, and, as has been said by high authority, whilst technical rules may be used to preserve rights, the court should never be astute to find rules or enforce technical rules which will permit a wrong.

The first point taken by the defendant is, that no privity or relation existed between the parties out of which any debt or obligation arose. In the abstract, perhaps, this might be so, but it is hardly an answer to shield a defendant who has (if I am right in the facts) the plaintiff's money in his hands, taken with full knowledge from a trustee for the debt of such trustee. Suppose these trustees had, without any regard to an existing contract or right, paid voluntarily the plaintiff's money to the defendant, would the point made avail them? I think not. The redress asked here on the facts arises in something not depending

on any contract or privity; in addition, the mere fact that the defendant dealt with the trustees individually is no answer.

If, through all the facts, it appears that, no matter what the form used was, the plaintiff's money was used with defendant's knowledge to settle private stock dealings between the so-called third parties and defendant, he is liable.

The defendant's counsel boldly takes the ground — and it seems necessary to sustain it in this case to relieve defendant — that, conceding the dealing to be directly with the company, no recovery can be had, because the plaintiff is *in pari delicto*. I should be sorry to think that the law in this country was in such a condition, that when trustees used the name of a corporation, and had dealt in that name with the knowledge of those they are dealing with, for their own benefit, their wrongful act could be upheld, merely because they used their *cestui que trust's* name to commit a fraud. I am not prepared to discuss such a question. It is, in my judgment, clear that the law presents no such case for the worst of wrongs. It is no answer to say that the company had the right to purchase its own stocks, or to retire a spurious issue; no such issue is set up by any answer, and none is pretended on the pleadings. The case is one where the defendant should be discharged altogether, or should be held to have taken the corporation's money without right. It was no settlement with the company, no purchase of its own stock by the company, or to retire a spurious issue; all parties to that settlement evidently understood it was to settle a contest between the defendant and directors of a corporation who had been declared, as the suits stated, delinquent to their trusts, and to enable them to return to the State from which defendant and his associates' acts had driven them. It would be monstrous to call it a settlement with the company. The defendant contends that the litigations settled by the compromise were really ruinous to the plaintiff, and their settlement was a relief to them. The fallacy of this is shown, when the situation at the time of settlement and the result of that settlement are considered. The pretense in the suit was the present plaintiff's benefit, and the compelling of the trustees to replace the stock so improperly issued; in fact to buy back from the defendant the stock so issued. The result of the settlement was to throw on the plaintiff the loss of the acts claimed by the present defend-

ant to be fraudulent, and in fact to take the present plaintiff's money to pay the loss which the fraud the present defendant pretended, in these suits, they were desirous of putting on the trustees. The pretense that these suits were not the acts of the present defendant, is negatived by the fact that when Drew made his peace in these suits, the settlement was with the present defendant, and when he received the money the suits were ended. The defendant and his friends, when these suits were brought, had the right, established in the New Haven Railroad cases, to hold this company for the loss they had sustained by the improper issue of its stock, which would leave the present plaintiff a right of action against its agents; or the defendant had the right to do as he pretended to do here: take steps to compel the trustees to return to the company the fraudulent stock and make the damage good; and attempts to do this would be applauded; but no right existed to use the process of the court to this apparent end, when his own end was obtained, by taking the trust funds to settle his claims. It is evident that the suits were used only to press the former defendants into a settlement with trust funds, and the pretense of doing justice to the present plaintiff was ended when the defendant had pressed the trustees into a settlement with himself.

It seems to me, whichever way the case is turned, the same result presents itself, and, unless courts are prepared to let trust property be sacrificed to the frauds of, its trustees, the defendant here must be held. It is said, by one of the counsel for the defendant, that the charge of fraud wholly fails. If in this case the facts here do not present in law such a case as will entitle the plaintiff to redress, I am mistaken. The evidence of Mr. Drew alone shows by what mode the suits which the defendant controlled were used, and did, in fact, compel the settlement, and how the trustees made their peace, and how they discharged their obligations by using the funds of the company to settle the claim; it may present no merits to the counsel, but it does to me.

It is unnecessary to discuss here to what extent a recovery can be had; it is only necessary to establish the use, with the knowledge of defendant, of any of plaintiff's funds, to hold him; the extent is for the court below, where the case is tried.

The claim that the transaction has been consummated, seems to me to beg the whole question.

The true question presented here in the facts above discussed, is this: What right has a corporation, defrauded by joint acts of its trustees and a third party?

It is hardly necessary to cite or discuss authorities to show the duties of trustees, or those dealing with them, as to the trust property; the authority cited by plaintiff fully sustains it, and the result from this is, that all who deal with such trusts must keep themselves ready to defend their right to money so obtained. The doctrine in the cases cited by plaintiff's counsel (Story Eq., § 125, C., 1258; *Bliss* v. *Matteson,* 22 N. Y.; Perry on Trusts, §§ 825, 855 ; 100 Mass., 382), contain authority on this point, if any were needed, as to what is supposed to be the foundation of law ; that is, to do justice; and I think the cases cited by plaintiff (Perry on Trusts, §§ 217, 272, 823, 828; *Bassett* v. *Noseworthy,* 2 Lead. Cas. in Eq., 103, 109), show that receivers of such money can be called on to account, when no new consideration has been parted with.

If I am in error in the facts, of course the conclusions are erroneous, but it seems to me that when the case is digested, there is nothing in it but the use of the process of the court against individuals for wrongs to the plaintiff, and for the alleged purpose of benefiting plaintiff, ending in a settlement that obtains the plaintiff's money for the very wrong done, not by, but to it, and leaves the plaintiff without redress. To sustain defendant's view would, it seems to me, on this evidence, lay down the law that trusting stockholders were helpless, and their property beyond the protection of the law. It seems to me that the evidence is clear that the suits, for the settlement of which the money was paid, were settled in fraud of the plaintiff's rights, and with their funds, and that such funds should be returned ; that there is evidence tending to prove notice to the defendant of the ownership of the funds, or some part of them, and that justice requires the refunding of it. That the findings below on the facts are erroneous.

The judgment should be reversed and a new trial had.

DANIELS, J. (dissenting) :

The object of this action was to rescind and annul the purchase or redemption of 50,000 shares of the plaintiff's stock, and the recovery of the consideration paid for the same. It appeared by the evidence, that the defendant and other persons acting with him were engaged in buying the stock of the Erie Railway Company, late in the year 1867, and early in the year 1868, during which period he purchased it to the extent of $10,000,000, par value. The effect of the purchases, as they advanced, was to enhance the market-price of the stock; and during their progress the plaintiff issued $10,000,000 of what were called convertible bonds. These bonds were convertible into the stock of the company, by being surrendered, and the stock, created for that purpose, taken in their place. And when it was understood, by at least one of the directors of the company, that the defendant had given his brokers an unlimited order for the purchase of the stock of the company, $5,000,000 of the amount was placed by such directors upon the stock market for sale. Without knowing that stock of that description had been issued, the defendant's brokers purchased about 50,000 shares of the plaintiff's stock, which afterward proved to be made up to a great extent of the stock created by the surrender of the convertible bonds. Actions were thereupon commenced in this court, one in the name of the people by the attorney-general, and three others by persons substantially identified in interest with the defendant, against the Erie Railway Company, its officers and directors, to restrain certain alleged contemplated misconduct of such directors and officers, and to protect the interests of the company, and for other similar relief. The defendant was not directly concerned in either of the suits, except the one prosecuted by Bloodgood, though the protection of his interests seemed identified with the success of all of them. While the ostensible purpose of the litigation was to protect the interests of the railway company, great reason exists for doubting that to have been the actual object designed to be promoted. The probability is that the suits were all commenced and prosecuted in the interest of those who had purchased the stock of the company and had been subjected to loss by means of the stock placed upon the market, and in great part purchased by them, which resulted from the issue and surrender of the convertible bonds.

Other litigation was also engendered in the strife, in which the defendant was made a party as one of the defendants. It is not necessary to refer more fully to these actions, because they are no farther involved in the present controversy than their adjustment and disposition were connected with the transaction out of which this action arose and to a certain extent produced it. The actions brought to restrain the alleged threatened acts of the plaintiff, its officers and directors, were prosecuted through a period of about five months, and during their existence appear to have restrained and embarrassed the operations of the defendants, including the business and financial affairs of the company. For that reason, relief from them was desirable, and to secure that was one of the objects its officers had in view in effecting the arrangement now sought to be annulled. The defendant testified that he had nothing to do with that litigation, but, from the other evidence given upon the trial, there is very good reason for believing that in that respect he was certainly mistaken. His interests were identified with it, and it was carried on by those who had previously acted with him in the stock transactions inducing it, and it was only disposed of, and the company relieved from its effects, after a satisfactory settlement had been made with him. Before that was done the litigation could not be controlled or adjusted, but, after that, the difficulty existing in that respect at once disappeared. There can be no doubt, taking all the evidence together, that a satisfactory arrangement and adjustment of the defendant's claim was in the nature of a condition to the termination and removal of the suits pending against the plaintiff and its directors, and that accordingly will be assumed as an established fact in considering the disposition which should be made of this case.

From the manner in which the stock, issued for the convertible bonds, was placed upon the stock market and received by his agents, the defendant appears to have claimed, and such was probably the truth, that he had been made the victim of a dishonest expedient, and that the officers of the company had no right to resort to it for the purpose of causing him to purchase stock which he neither designed to buy nor supposed he was buying. The original object of the defendant and his associates was the purchase of the company's

stock, as it then existed in the market, not the purchase of that which might be issued in consequence of a device resorted to for the purpose of increasing its quantity and correspondingly reducing its value in order to subject them to a loss. He, therefore, was in a position where he had grounds of complaint, which, even according to the moral code of stock operators, might not be wholly without foundation. And that, according to the evidence, was the view taken by himself of the purchases he had made through the success of the expedient resorted to for making him the owner of the newly issued stock. He could, with a reasonable degree of plausibility, insist that the stock itself was unlawfully issued, and that the artifice through which he was made to purchase it entitled him to redress. And that he did that is clearly manifested by the evidence which was given upon the trial by the witnesses Gould and Fisk. If he was right in those positions, then the company was liable to him for the loss he had sustained by becoming the owner of the convertible bond stock. (*Bruff* v. *Mali*, 36 N. Y., 200, and cases cited in opinion.) The claim was substantially made with the determination of maintaining it by such means as might prove advantageous for that purpose, and among them the design seems to have been included of harassing the company by litigation for the purpose of securing its adjustment. Under those circumstances Drew, the treasurer at that time of the company, at first entered into an arrangement with the defendant for the purchase from him of 50,000 shares of the stock, and for his holding another 50,000 shares for an indefinite period of time. This was apparently made, on the part of Drew, to provide him with the means of controlling the company until after the next succeeding election, and on the part of the defendant for the purpose of retrieving the losses he had sustained by his purchases. But that arrangement was never carried into effect between the persons who were the parties to it. Drew was either unable or disinclined afterward to fulfill his agreement, and consented that Eldridge, the president of the company, and Gould, who was a director and finally succeeded Drew as treasurer, should become the purchasers of the stock instead of himself. And they accordingly entered into, and afterward performed, the agreement which it was the object of this action to rescind. By that agreement the

defendant agreed to sell to them 50,000 shares of the Erie Railway Company stock, at seventy cents on the dollar, and they were to pay him $1,000,000 for the losses he had sustained by means of his purchases, and for withholding from sale for four months 50,000 other shares of the plaintiff's stock; and the suits against the company and its directors were to be adjusted and withdrawn. The agreement made by them for the purchase of the stock contemplated and provided for its sale to them, as distinguished from the company itself, but they, in fact, were acting at the time for the company. And from the evidence which Fisk gave, it would seem to have been so understood by the defendant, although he himself denied the existence of any understanding of that nature. But, under the supposition that the agreement which they made with the defendant would be performed, the persons in whose names the suits were prosecuted adjusted their claims, and the litigation was brought to an end at once. And then, upon the order of the defendant, 50,000 shares of its stock were delivered to the agents of the plaintiff's officers, and the consideration for that, and for withholding another 50,000 shares from sale for a period of four months, was paid to the defendant and his agents. This payment was made by the delivery of $1,250,000 in the bonds of the Boston, Hartford and Erie Railroad Company, guaranteed at eighty per cent by the plaintiff, amounting to the sum of $1,000,000, and by checks for cash, amounting in the aggregate to the sum of $3,500,000. The bonds transferred and the money paid were, in fact, the property and money of the plaintiff, and the stock was received for it by its president and treasurer, who were only its nominal purchasers, and it is that money and property which the plaintiff endeavored to recover in this action, after having tendered a return of 50,000 shares of its stock to the defendant. When the tender was made, it was not proposed to restore the litigation, nor to adjust any claim which might arise out of withholding the other 50,000 shares for four months from sale, but in the view which, under the circumstances proved, should be taken of the rights of the parties, no consideration of the effect of that omission will be rendered necessary. It was claimed upon the argument of the appeal, that the arrangement made for the adjustment of the controversy was collusive and fraudulent, and that the corporation had no power to

make it. And if it had appeared that the defendant was a party to any fraudulent scheme for misappropriating or misapplying the plaintiff's property, and had acquired its money and bonds in that way, there would be no ground whatever for doubting its right to maintain this action, upon a complete rescission of the agreement and a restoration of all that had been received under it. But the evidence entirely fails to establish the conclusion that he was complicated in any fraudulent device or expedient of that nature. All that was given in the case relating to his position, showed that he claimed that the stock issued through the means of the convertible bonds, was improperly imposed upon him, and that he was consequently entitled to be relieved from it and compensated for the losses it had occasioned him. The evidence of Gould and Fisk is clear and explicit on that subject, and the court assumed its truth in dismissing the complaint. That was the nature of the demand made by him, and, so far as the litigation against the company was subject to his control, it was maintained for the purpose of enforcing that demand. His position throughout was one of unequivocal hostility, rather than of connivance or collusion, and the officers of the company only yielded to it so far as they seemed to prove incapable of resisting it. Each party acted independently, and conceded only what there was no prospect of successfully withholding.

The argument that the company had no authority to enter into or perform the agreement which was made, seems equally incapable of being sustained. For what was done, was clearly distinguishable from dealing in and purchasing its own stock. The claim, in substance, which was made, was that the stock that was the object of the arrangement, had been collusively and unlawfully issued for the purpose, by increasing the supply, of defrauding those who, at the time, were engaged in buying it, and that the obligations of the company concerning it were of an exceptional character, on account of those circumstances. The defendant insisted that he should be relieved of the stock, and compensated for his losses incurred by purchasing it, substantially for those reasons. And that claim was persistently urged and maintained through all the negotiations which were had for the adjustment of the controversy. If the claim should prove to be well founded, the company was probably liable to make the defendant good.

And, if that was the case, it could do so by compromise as well as by the result of a suit. For, where an apparent liability is asserted against a corporation, it must have the same power as an individual to adjust and settle it, without first subjecting itself to the trouble and expense of litigation before it can be at liberty to act in such a manner as its interests may require. Whether the circumstances attending the issuing and sale of the stock were such as to create a liability, was a question which addressed itself directly to those to whose charge the interests of the plaintiff had, for the time being, been committed. And they appear to have given it sufficient consideration and reflection to convince them that the company was liable. For, after procuring the opinion of reliable counsel, as to the legality of the step which was contemplated, it was sanctioned and approved by the board of directors, and then carried into execution. This action of theirs constituted a substantial concession that the adjustment proposed by the defendant was not only lawful, but, beyond that, a proper and expedient mode of settling the existing controversy. And the power of the corporation to make it, certainly seems to be reasonably free from substantial doubt. A material part of the business of its board of directors must have consisted in the consideration of claims made upon the company, and the expediency of settling them without legal proceedings. After full examination and reflection, aided by the advice of eminent counsel, and a decision finally made and consummated by a settlement, it must be too late to gainsay what was done, as long as no mistake or misrepresentation can be shown to have induced the adjustment made. The directors and officers of the company acted with full and complete knowledge of the claim made, the circumstances relied upon to sustain it, and of all that affected the propriety of its allowance and settlement; and, after doing that, concluded that an acceptance of the defendant's terms was the best alternative for adoption, and satisfied his demands.

Their action in that respect was within the province of their authority, and the courts can do nothing less than to sustain it, for the law favors the amicable adjustment of controversies; and when they are fairly made in good faith, and not induced by artifice, mistake or fraud, its policy is to consider all further controversy upon the subject closed. This rule is very well settled. (*Russell*

*v. Cook,* 3 Hill, 504; *Stewart* v. *Ahrenfeldt,* 4 Denio, 189; *Farmers' Bank of Amsterdam* v. *Blair,* 44 Barb., 641; *Adams* v. *Sage,* 28 N. Y., 103; *Vosburgh* v. *Teator,* 32 id., 561; *Lucy's Case; In re Midland Railway Co.,* 4 De Gex, McN. & G., 356; *Palmer* v. *North,* 35 Barb., 282; *Cook* v. *Wright,* 101 Eng. Com. Law. 559; *Nelson* v. *Inhabitants of Milford,* 7 Pick., 18; *Home Ins. Co.* v. *North-western Packet Co.,* 32 Iowa, 224; *Augusta* v. *Leadbetter,* 16 Maine, 47.) And no good reason exists which would justify the omission to apply it to this case. Under the most favorable view which can be taken of the facts for the plaintiff, the judgment which was directed at the trial was right, and it should therefore be affirmed, with costs.

LAWRENCE, J., concurred in opinion of DONOHUE, J.

Judgment reversed and new trial ordered, costs to abide event.