ABBY R. LORING & others *vs.* GEORGE BRODIE & another.
SAME *vs.* SAME.

Suffolk.     Nov. 17, 1881; March 20, 1882. — March 12, 1883.     COLBURN
& HOLMES, JJ., absent.

If a cashier of a bank receives securities on a loan from the bank to a trustee, with knowledge that the securities belong to a trust, the bank is affected with the knowledge of its cashier, and is put upon inquiry as to whether the trustee has authority to pledge the securities.

If a promissory note to a bank is signed by the maker, as trustee, and a portion of the securities deposited as collateral therefor is clearly marked as trust property, it must be inferred that the other securities, consisting of bonds capable of manual delivery, are also trust property.

A power in a trustee to sell trust property, and change investments, gives him no authority to pledge the property.

If a bank receives as collateral security for a loan bonds capable of manual delivery, and is affected by the knowledge of its then cashier that the bonds are trust property, it continues to be affected by such knowledge, so long as the transaction continues, although its form is changed by new notes given in renewal, from time to time, after the cashier had ceased to be connected with the bank.

If a bank makes a loan on certificates of stocks, which show on their face that they belong to a trust estate, the bank is affected with knowledge of this fact, whether the certificates are read by the officers of the bank or not.

If bonds are unlawfully pledged to a bank by a trustee, and the bank, with knowledge of this, sells them, it is liable for the value of the bonds, together with interest from the time of the sale, and such interest as it may have received on them before the sale.

An indenture of trust, executed in this State, gave the trustee power to manage and improve the trust estate, and receive the income and profits from time to time, and also to sell or exchange the whole or any part of the trust estate, and the proceeds to invest in any other real or personal estate. The trustee applied to a bank here for an advance on cotton to be shipped from a distant State, proposing to forward to the bank drafts on the consignee of the cotton, and, to further protect the bank, offered to pledge personal securities belonging to the trust estate. He also falsely represented that the cotton was grown on plantations belonging to the trust. The bank, without further inquiry, accepted the proposal, and took the securities, knowing that they formed part of the trust estate. *Held*, that the bank was liable for the value of the securities to the trust estate.

If a cashier of a bank is also acting as agent of a person, an account rendered by him as agent to his principal of moneys deposited in the bank and drawn out by him, as agent, is not admissible as primary evidence as against the bank.

If a bank, in which a trustee has an account, permits him to overdraw his account, and to pay the overdraft with the proceeds of trust property, which he had a right to sell, the bank is not responsible to the trust estate, if the money overdrawn is misused by the trustee, in the absence of evidence that the money was overdrawn under such circumstances that the bank was fairly put upon inquiry, whether the money was to be used for other purposes than those of the trust.

DEVENS, J.   These are two bills in equity against George Brodie and the Merchants' National Bank.   They proceed against the defendant Brodie for breach of two different indentures of trust, and against the defendant bank as the recipient, with equitable notice of the existence of the trust, of certain portions of each trust estate, as collateral security for, or in payment of, debts due the bank from Brodie individually. These funds consisted of stocks and United States bonds, and also of cash, the proceeds of certain real property belonging to the second estate, sold by Brodie and paid to the bank.

The first bill seeks a conveyance from the defendant bank of six shares of the York Manufacturing Company, ten shares of

the Essex Manufacturing Company and ten shares of the Fitch-
burg Railroad Company, alleged to have been held in trust for
the plaintiffs, under an indenture of December 25, 1849.

The second bill seeks a conveyance from the defendant bank
of eighty shares of the Fitchburg Railroad Company, twenty
shares of the Essex Manufacturing Company and fifteen United
States bonds of $1000 each, and also the restitution of certain
moneys, being the proceeds of sales of real estate, which stocks,
bonds, and real estate are alleged to have been held in trust
for the plaintiffs, under an indenture of December 12, 1865.

Brodie has been defaulted, and, the bills against him being
taken *pro confesso*, his liability for the misappropriation of the
bonds, stocks and moneys is established.

The issue, so far as the responsibility of the bank is concerned,
naturally divides itself into three inquiries: 1st, as to the United
States bonds which were a portion of the trust property; 2d, as
to the stocks; 3d, as to the moneys received from sales of real
estate. Although there are two distinct trusts, it will not ap-
parently be difficult to separate the property belonging to each,
so as to render the appropriate decree in each case.

All the transactions as to the United States bonds terminated
in a note, signed by Brodie as trustee, for the sum of $15,000,
dated November 21, 1874, for which it was agreed between
Brodie and the bank that the bonds should be held as security,
and to the payment of which they were subsequently appropri-
ated by the bank. It is to be considered whether they came
into the possession of the bank under such circumstances as in-
formed the bank, or fairly placed it on inquiry, as to whether
it was dealing with trust property without proper regard to the
rights of the beneficiaries. There were no United States bonds
included in the first, or earlier trust; they formed a portion of
the second. In order to ascertain the liability of the bank, it
is necessary to examine the history of previous transactions as
to the bonds, so far as it is disclosed by the evidence.

On December 20, 1865, J. K. Fuller was, and for a long time
had been, the cashier of the defendant bank. He was appointed
attorney by Brodie to collect the dividends on the stocks held by
him as trustee, and a list was appended to the power, enumer-
ating eighty shares of the Fitchburg Railroad Company, twenty

shares of the Essex Manufacturing Company, two shares of the Old Colony Railroad Company, and fifteen bonds of the United States for $1000 each. Fuller receipted to Brodie for the bonds for safe keeping, signing the receipt as cashier; and, throughout the transactions that took place, he acted, or assumed to act, for both Brodie and the bank.

A letter was written on April 27, 1867, by Fuller to Brodie, that the bank would make him a loan, but would require him to send a note as trustee specifying the bonds as security. This may fairly be deemed an official communication, on behalf of the bank, of the terms on which it would deal with him. Shortly after, a loan was made to him of $6000. All the notes were not given in evidence which are referred to in the accounts of the bank, but apparently from that time, during the cashiership of Fuller, Brodie as trustee was always indebted to the bank for loans secured by pledge of these bonds, as well as of other of the trust funds. Several notes were put in evidence from Brodie to the bank, in which the security was specified " as a deposit of United States bonds," and one note specifies the security as a deposit of United States bonds then on deposit in the bank. Of these notes the most important is that of September 13, 1869, for which the collateral security specified was "15 bonds of 1000 each, and 90 shares of Fitchburg R. R."

Fuller left the bank on February 1, 1873. It is the contention of the defendant bank that, whatever the character of the transactions with Fuller, they were terminated; and that it was by a distinct transaction, which occurred after one Chapman became cashier, that these bonds became collateral security for the note, for payment of which, or for that of the note which was substituted therefor, they were eventually sold.

Before determining this fact, it will be well to inquire what the legal position of the parties to these notes was while Fuller was cashier. The plaintiffs contend that this note of September 13, 1869, was still in existence when Chapman became cashier, and was the foundation of the note of November 21, 1874, given subsequently to Chapman's incumbency of the office, upon which the bonds were sold. If these bonds could not have been devoted by the bank to the payment of the note of September 13, 1869, on account of any notice under which the bank

received them, it is not of importance that the form of the note for which they were held as security was changed before this sale was made.

That Fuller knew that these bonds were trust property is quite clear. The schedules which were given him when he became the attorney of Brodie, and took them into his possession, specified them by numbers. He was distinctly referred to the trust deeds for the enumeration of these as well as the other property of the trust. As cashier, he had asked for a pledge of these bonds in reply to an application for a loan by Brodie. The notes of Brodie were signed by him as trustee, which afforded evidence that the bonds were trust property, especially as stocks which showed upon their face that they were trust property were united with them as collateral security. By law, the bank is entitled to exercise, by its board of directors, or duly authorized officers or agents, all such incidental powers as shall be necessary to carry on the business of banking. The cashier of a bank is its executive financial officer. It is under his direction that its moneys are received and paid out, that its debts are collected and paid, that its securities are kept and transferred. Such powers as are habitually exercised by cashiers must be held, so far as the public is concerned, to have been conferred upon Fuller by his election to the office. *Merchants' Bank* v. *State Bank*, 10 Wall. 604. Whether he was or was not entitled, by authority of the bank, to make loans or discounts, or whether these were actually made by him, is not expressly shown; but, in any event, he was the officer to receive information and conduct the negotiation in regard to them with the bank, to pay out its moneys and receive the securities therefor. If he received the securities with a knowledge that they were wrongfully transferred, and were the property of others, his knowledge must affect the bank. His attitude and relation were such that it was his duty to communicate this information to the bank; and it cannot be deemed that he was a mere channel of transmission, and that his knowledge is to be treated as affecting only himself. Although he was the attorney of Brodie in taking care of and managing the trust property, he was the cashier also, and there was a confidence reposed in him as such which makes his knowledge the knowledge of the bank.

Even if it be true that, when an agent, in collusion with his principal, is engaged in a transaction, the effect of which would be to obtain from another, for whom he is also acting, money by false pretences, it will be presumed conclusively that he made no communication of the facts, (which is asserted in *Cave* v. *Cave*, 15 Ch. D. 639,) this will not enable the bank to escape responsibility. So far as the conduct of all parties to the transaction is shown, it does not seem that they supposed they were engaged in a wrongful transaction. They apparently thought that they might properly do what they continued to do, and repeatedly did. But if it be treated as if they knew that they were acting wrongfully, where the rights of third persons are concerned, the loss by such transactions must fall on that principal who has enabled his agent to commit the fraud. If Fuller was the instrument of Brodie in committing a fraud on the bank, by unlawfully transferring to it the securities of another, whether he concealed this fact or not, the bank could not take the securities from his hands, or hold them in its custody, except with the knowledge he had. The only authority the bank could have to hold or sell them was under the contract made by or through Fuller, its cashier. Thus, in *New Milford National Bank* v. *New Milford*, 36 Conn. 93, the same person being town treasurer and cashier of the bank, executed as treasurer a note to the bank, fraudulently and without authority, and applied the money thus obtained to his own use. It was held that his fraud as treasurer was known to him as cashier, that by that knowledge the bank was bound, and that there could be no recovery on the note against the town.

But whether the bank would or would not be bound by this knowledge of the cashier, enough is shown, before the retirement of Fuller, to have given notice to its directors that Brodie was dealing with trust funds, and assuming the right to pledge them, and that the United States bonds were such funds. They thus were bound to ascertain his rights in this regard. They cannot deny a knowledge of the terms of the notes which they discounted, and of the securities pledged for them. Notes were signed by Brodie as trustee in several instances, secured by United States bonds, which were discounted before September 13, 1869, and the note then given was secured by ninety shares of

the Fitchburg Railroad Company, held by Brodie as trustee, as well as by $15,000 in United States bonds. This is the first note apparently for which any of the stocks were used as security. Even if we should admit the proposition of the defendant bank, that the mere fact that a trustee gives, as collateral security, bonds which have no means of identification does not notify the bank that they are trust property, yet such is not this case, for the stock was obviously trust property. When a note is signed by one as trustee, and a portion of the collateral security is clearly marked as trust property, it must be inferred that the rest, consisting of bonds capable of manual delivery, is also such.

It is to be noticed, also, that, before the retirement of Fuller, the other stocks sought to be recovered in these suits had all been transferred to the bank as collateral security, (although it does not appear clearly in connection with which notes they were thus first used,) and that they all distinctly appeared to be trust property.

In any aspect, the evidence appears to us to show that the bank had sufficient notice that the bonds, as well as stocks, were trust funds; and that Brodie as trustee was assuming to pledge them; and thus it was the bank's duty to ascertain whether he had a right so to do. *Shaw* v. *Spencer*, 100 Mass. 382. *Hayward* v. *Cain*, 110 Mass. 273. Had inquiry been made, and had an examination of the indentures taken place, they would have shown no authority to pledge the bonds or stocks, even if Brodie was undertaking thus to benefit the trust. Such authority could not be derived from the power to sell the property and change the investments, which is there found. *Wood* v. *Goodridge*, 6 Cush. 117. *Haldenby* v. *Spofforth*, 1 Beav. 390. *Page* v. *Cooper*, 16 Beav. 396. *Russell* v. *Russell*, 36 N. Y. 581. 2 Perry on Trusts, § 768, and cases cited.

The bank contends that, whatever the relation of Fuller to it, and whatever responsibility it might be under had the notes taken while he was cashier resulted in the sale of these bonds, such transactions were entirely concluded before Fuller's retirement; that the loans, for which the bonds were security, made when Chapman was cashier, had no relation thereto; that Chapman had no knowledge that the bonds were those of a trust estate; and that the bank cannot be affected by a knowledge

which it had in a former transaction, or with which it might be affected in a former transaction by the knowledge of its then cashier. Chapman became cashier on July 1, 1873. He testifies that there was at that time but one note signed by Brodie as trustee, which was of the date of December 19, 1872, and was secured by six shares of the York Manufacturing Company, thirty shares of the Essex Manufacturing Company, and ninety shares of the Fitchburg Railroad Company. According to his statement, this note was paid as follows: February 7, 1873, $1000; March 18, 1873, $2000; and the balance on September 18, 1873, by a new note of $12,000, secured by $12,000 of United States bonds. He also testifies that, on October 1, 1873, $1000 was lent to Brodie, and a $1000 United States bond taken as collateral security; and that, on November 11, 1873, $2000 was lent and $2000 of United States bonds taken as collateral security. All of these notes, on November 21, 1873, were combined into one note for $15,000, and all the bonds held as collateral to it. This note of December 19, 1872, is not produced. The note of September 13, 1869, is produced, with its indorsements. This note was for $20,000, and was secured by ninety shares of the Fitchburg Railroad Company, and $15,000 of United States bonds. By an indorsement, it appears that $5000 was paid upon this note on July 23, 1872. There was therefore $15,000 due on it when Chapman became cashier. The indorsements upon it, made in the handwriting of the discount clerk, show that the identical payments which Chapman testifies to as having been made on the note of December 19, 1872, were in fact made upon this note. Those two payments being made, the note was reduced to $12,000, and this must therefore have been the sum included in the note of September 18, 1873, and not the balance due on a note of December 19, 1872. It is not shown that any of the bonds by which the note of $20,000 was secured had been given up, and the inference is inevitable that these bonds came into the hands of Chapman as security for that note, upon which a balance of $15,000, without computing interest, was due when Chapman became cashier. For the note of September 18, 1873, $15,000 of United States bonds were left as security, and we deem it proved that the note of September 18, 1873, was for the balance due on the note of

September 13, 1869, for $20,000, secured by stocks and bonds. The effect of this transaction was simply to leave all the bonds which had been held as collateral security for the balance of the note of $20,000 now liable for the note of September 18, 1873. Two subsequent loans were made, which were afterwards incorporated with the note of September 18, 1873, and thus made the note of November 21, 1874, but no additional bonds appear to have been delivered to the bank. The note of October 1, 1873, is for the sum of $2000, and contains the words "have left as collateral security therefor U. S. bonds;" that of November 11, 1873, does not purport to be secured by bonds. That these three notes constituted that of November 21, 1874, is stated by Chapman, and for this the security given is $15,000 of United States bonds. The same security is therefore held for the note of November 21, 1874, that was held for the note of September 18, 1873, and which had previously been held as a part of the collateral security for the note of September 13, 1869. It must be inferred that these bonds are the same, when the only object of the note of September 18, 1873, was to apply the bonds alone as security for a note which should represent the balance then due on the $20,000 note of September 13, 1869, and thus release the other security in the way of stocks; and the only apparent object of the note of November 21, 1874, was to include in one note, and thus secure by the same collateral security, the sum represented by the note of September 18, 1873, and the two subsequent loans respectively of $1000 and $2000.

Whether there was or was not in the bank when Chapman became cashier a note of December 19, 1872, secured by stocks, the transactions as to these bonds were but a continuation of the original transaction of September 13, 1869, as to bonds, and we are satisfied that Chapman is in error, when, in his testimony, he treats the United States bonds as for the first time, during his conduct of affairs, deposited in the bank as security for the note of September 18, 1873. The evidence which comes from the notes and the indorsements must control his statement, and compels us to consider his recollection of the matter at fault.

Such being the case, the contention of the defendant bank that, if it is held liable, it must be on the ground that "at some earlier period of time, while Fuller was cashier, the bank had

taken United States bonds as collateral for loans to Brodie as trustee, and that Fuller was cognizant at the time that these bonds were the property of the trust, that Fuller's knowledge is the knowledge of the bank, and that this knowledge will by law affect the bank in all its future transactions with Brodie as trustee, in which he pledged bonds of a similar character, although Fuller had ceased to be its cashier," presents an inquiry that does not here arise. Upon the facts as we find them, the bank received these bonds charged with the knowledge that they were trust property, and with the knowledge that they were not used for the legitimate purposes of the trust, or rather with the duty of ascertaining whether they were so used. They were never restored to the trustee, and no new and distinct transaction ever took place. The form of the note was changed as the amount originally due on it was diminished, and other securities were released as the bonds became a sufficient security for the balance due, which was expressed by the new note of September 18, 1873, for which, when further advances had been made, the note of November 21, 1874, was substituted, upon which the bonds were sold. Whatever may be the law as to subsequent and distinct transactions, and how far the bank is to be affected by knowledge acquired in or duties arising from previous transactions, is not here important. While the same transaction continues, however its form may change, the knowledge or the duty which existed at the time of its inception is still attached to it. It must be held, therefore, that the bank knew that the bonds belonged to a trust, and it was a duty that it should inquire whether there was any authority to pledge them, which inquiry would have revealed the misuse made of them by Brodie.

If we accept Chapman's statement as correct, the result would not be different. According to that, when he came into the bank there was a note of December 19, 1872, for the sum of $15,000, secured by the stocks in dispute. All these stocks showed distinctly, by the certificates or the transfers, that they were the property of these trust estates. Whether Chapman read them or not, the bank must have imputed to it the knowledge which they bore upon their face. It was known, therefore, that they constituted trust property pledged for a note of the trustee. When therefore these were released, and a new note was given on

September 18, 1873, by the trustee, with United States bonds as collateral security for the amount then due on the note of December 19, 1872, Chapman and the bank were fairly put on their inquiry whether the bonds were not trust property also. This inquiry was never made, and we cannot infer that it would have been useless.

We are therefore of opinion that the bank is responsible to the plaintiff in the suit upon the trust created in 1865 for the amount for which these bonds were sold by the bank, together with interest from the time of sale and such interest as it may have received thereon previous to such sale.

The next question concerns the responsibility of the bank for the shares of stock, part of which belong to each of the trusts which the two bills seek severally to protect or enforce. The stocks belonging to the respective trusts were not kept separately in the certificates by Brodie, but an examination of the indenture under the first trust shows that it included ten shares of the Essex Manufacturing Company, ten of the Fitchburg Railroad Company and six of the York Manufacturing Company, while that of the second trust included eighty shares of the Fitchburg Railroad Company and twenty of the Essex Manufacturing Company. The certificate of thirty shares of the Essex Manufacturing Company, which was held by " George Brodie, trustee of the estate of Christian W. R. Loring," which was transferred to the Essex Manufacturing Company, included the shares belonging to each estate, while the certificate for ninety shares of the Fitchburg Railroad Company to George Brodie, trustee, included the ten shares belonging to the first trust with the eighty shares belonging to the second.

We have already stated our reasons for finding that, when Fuller left the bank, there remained the note of September 13, 1869, secured by $15,000 of United States bonds and ninety shares of the Fitchburg Railroad Company. Whether there was also, as stated by Chapman, a note of December 1872 secured by ninety shares of the Fitchburg Railroad Company, thirty of the Essex Manufacturing Company and six of the York Manufacturing Company, there is no doubt that the giving of the note for $12,000 on September 18, 1873, for which $15,000 of United States bonds were held as collateral security, operated to release

the stocks theretofore held as collateral, so that Brodie was entitled to them.  Whether they were actually delivered to Brodie is not perhaps important; they either came back to the bank, or it was allowed to retain them by reason of a contract, substantially contemporaneous, entered into with Chapman with the concurrence of the president of the bank, and described by him substantially as follows: Brodie, as trustee, applied to the bank for an advance upon cotton to be shipped from Arkansas, to secure which he proposed to forward to the bank drafts on the consignees of the cotton, as shipped, and, to protect the bank from ultimate loss by reason of the drafts to be made by him in anticipation of shipments, offered to pledge as security the shares in question, together with two additional shares of the Essex Manufacturing Company.   He accompanied his proposal by a statement that the cotton to be shipped " was raised on plantations belonging to his trusts; that he had usually sent the cotton to New Orleans, but, on inquiry among manufacturers here, he found that he could do better for his trusts by sending it here."  " He proposed to make the drafts and do the whole business in the name of George Brodie & Son."   George Brodie & Son " were a banking-house at Little Rock, and he could," as he stated, " negotiate his drafts on better terms through a banking-house than doing it directly."   The account was to be kept on the books of the Merchants' Bank in the name of George Brodie & Son, who were to draw on the bank, as from time to time they might need; but, as drafts or acceptances might not be paid, or drafts not accepted, and the account might be overdrawn, he proposed to give the bank as security the York, Essex and Fitchburg stock, " the same as we," the bank, " had had before," with two additional shares of Essex stock.   Brodie said he had a right to pledge these stocks for a debt of George Brodie & Son, that the cotton and all the transactions were for the benefit of the trusts, and that the cotton all belonged to the trusts.   The proposal made to the cashier was assented to by the president of the bank, and the transaction began.

That there was no plantation or cotton belonging to the trusts is not now disputed.   It was a speculation entered upon by the trustee in collusion with Brodie & Son, if in truth Brodie & Son are different persons from Brodie.   The overdrafts of Brodie &

Son had amounted in November 1873 in all to $10,000, and three notes, amounting together to that sum, each note secured by ninety shares of the Fitchburg Railroad Company and six of the York Manufacturing Company, had been given therefor by George Brodie & Son. On May 1, 1874, the overdrafts had amounted in addition to $12,909.59, for which a note was given "secured by a deposit of shares in the York Manufacturing Company, the Fitchburg Railroad Company and the Essex Manufacturing Company, and United States bonds." This note was signed by George Brodie & Son. About $4000 having been paid on these notes on or before November 21, 1874, on that day, for the balance due, $18,603, George Brodie, trustee, gave his note, purporting to be secured by ninety shares of the Fitchburg Railroad Company, six shares of the York Manufacturing Company and thirty-two shares of the Essex Manufacturing Company, which securities were then in the possession of the bank. George Brodie, trustee, on September 9, 1869, had transferred to the bank ninety shares of the Fitchburg Railroad Company, as security for the indebtedness of George Brodie, trustee, to the bank. On November 25, 1874, the bank transferred to Brodie, trustee, these ninety shares, this being done by Brodie as attorney for the bank, and Brodie, trustee, then transferred them absolutely to the bank. While the certificate of the Essex Company stock to George Brodie as trustee of C. W. R. Loring had been in the bank as collateral security, as shown by the evidence of the recitals in the notes and the statement of Chapman, the actual transfer to the bank, which was absolute, was not made until November 24, 1874, and the handwriting of the body of the transfer is that of Chapman. A signature in blank was on the back of it, of Brodie, trustee. This certificate was in the name of Brodie, trustee of the estate of Christian W. R. Loring. No new assignment, in connection with the note of November 21, 1874, was made of the stock in the York Manufacturing Company. The certificate of this was in the name of Brodie as trustee of the estate of C. W. R. Loring, and it had been assigned to the bank, in some previous transactions, as collateral security, on April 5, 1870.

That, at the time when the agreement as to the proposed cotton enterprise began, and also when the note of November 21, 1874, for $18,603, was given, the bank knew that the stocks in

question were trust property, is not disputed.  It is equally clear that the estate to which the property belonged was well known. The certificates afforded ample evidence of this.  The bank had full notice that it was dealing with a trustee who was pledging trust funds to carry on cotton operations, conducted in the name of another party, whose overdrafts were to be made good by a pledge of trust funds.  It made no investigation as to whether the trust was in writing, or what the provisions were that permitted a transaction in regard to trust property, which was so unusual that it was calculated to induce careful examination.  No inquiry was ever made of any one interested in this estate, nor of any of the beneficiaries, some of whom must have been known at the bank, as payments were made to them by the cashier.  The bank was contented with the simple statement of Brodie, that this cotton came from the trust property, and that he was carrying on all these cotton transactions for the benefit of his trust; and no details of the business were asked or given.  It is said, that, even if the instrument of trust had been examined, it would not have shown that the plantation from which Brodie pretended that the cotton came was not the property of the trust. The indentures would certainly have shown that no such property as a cotton plantation was embraced in them, and that the only real estate conveyed thereby was in the vicinity of the city of Boston.

It is also said that, as there was a power to sell and reinvest the trust property, a cotton plantation in Alabama might have been bought, and therefore it would not have been known but that there was such property.  To this there are two answers: First, that, if it appeared that there had been such a change in investments as to make the trustee, as such, the owner of a cotton plantation in a remote State, which could not be conducted but by advances of money, ample evidence would have been afforded that the trustee was dealing with the funds of the estate in a manner not contemplated by the indenture.  A power to manage and improve an estate, and to change investments, cannot be interpreted as authorizing the trustee to enter into hazardous and speculative enterprises, and, in order to do this, to raise money by pledge of other investments.  No authority existed to embark in enterprises for the sake of making money

for the trust by incurring .the hazards of business. Each indenture gives the trustee power to "manage and improve said trust estate, and receive the income and profits thereof from time to time." It also gives him the power, "whenever he may deem it expedient or proper, to sell or exchange the whole or any part of the trust estate, and the proceeds to invest in any other real or personal estate." Although the word "profits" is used in the power first given in connection with the word "income," it is used in the sense of "proceeds," and it would be a forced construction which should infer from it so extraordinary a power as that of embarking in such enterprises. No one who read the instrument of trust could have believed that it conferred such authority.

In the second place, had inquiry been fully and fairly made, the fact that there was no cotton plantation would almost necessarily have been developed. No deeds to the trustee could have been exhibited, and equally it would have been impossible for him to have traced the sale or exchange by which he had become, on behalf of the trust, the owner of such an estate. Notice of the existence of an instrument of trust affects the party purchasing trust property with full notice of its contents, whether he chooses to examine it or not. This is conceded. He should be thus affected, not only by what appears upon the face of such an instrument in terms, but by the information given by it, if such information, when made the subject of fair and reasonable examination, would show the conduct of the trustee to be such as it did not permit. The inquiry made of the trustee was of the most perfunctory character. His proposal, in itself suspicious, was accepted upon an improbable statement, which there was no attempt to investigate, when investigation might have developed its falsity, and when a knowledge of the estate and of some of its beneficiaries afforded the means of a proper investigation. When inquiries are never made, and the instrument of trust not examined in connection with them, it is not to be assumed that they would or could have been answered by replies, which, although false, would have been clear, consistent, and such as would have baffled an intelligent scrutiny. Were we to hold the bank to be exonerated from neglect in this matter, and to have performed its whole duty, it would be to say

that trust property might be disposed of by pledge at any time, if the party taking the security had the assurance of the trustee that he had the right to convey it. The plaintiffs are therefore entitled to the ninety shares of the Fitchburg Railroad Company, six shares of the York Manufacturing Company and thirty shares of the Essex Manufacturing Company, by decrees which shall oblige the defendant bank to return to each trust its appropriate portion, with the dividends received thereon.

The next claim is for the restitution of certain moneys, the proceeds of real estate sold by the trustee Brodie, which were received by Fuller, by him paid into the bank, and by it, as the plaintiffs aver, devoted to the payment of private debts due from the trustee; and this upon the ground that, although Fuller was the agent of Brodie, yet he was at the same time the cashier of the bank, and that it is therefore chargeable with notice of the fact, known to him, that the funds were trust property. So far as this position relates to the knowledge of the bank, it appears to us correct. If the act of Fuller was merely to pay the money to the receiving teller, another agent of the bank, he himself was the general financial agent, in whose custody and under whose general supervision all its funds were kept. His knowledge was not merely such as it was his duty to communicate, and which therefore it must be held that he did communicate, but it was itself the knowledge of the bank. The bank could not receive funds except charged with the knowledge which the cashier had, and subject to the responsibilities which that involved.

The proofs offered show three several sums thus paid to Fuller, which were by him paid into the bank, which were trust property, namely, the proceeds of three estates held under the second indenture; the first paid in by S. B. Allen on August 7, 1871, amounting to $9000; the second, the amount received by the discharge of a mortgage on August 17, 1871, of $3028; and the third, the amount received from the sale of a certain other estate on December 13, 1871, of $8048.33.

This being shown, it is of course necessary to be proved that these sums, or a definite portion of them, were devoted to liquidating the private indebtedness which Brodie owed the bank. To prove this, the plaintiffs do not offer the books of the bank,

but certain accounts rendered by Fuller to Brodie, which he states are the same as the books of the bank. Their reception was objected to; and, so far as establishing a liability of the bank is concerned, these accounts do not seem to us to have been admissible. In rendering them, Fuller was certainly not acting as cashier of the bank, but as the agent of Brodie. The books of the bank were in existence, and should have been produced. There was no occasion for secondary evidence of their contents. These accounts were not used to refresh the memory of the witness as to the state of the transactions with the bank. He had no recollection of the transactions derived from the accounts to which he testified.

It is not important, however, to pursue this matter, as even if the accounts rendered by Fuller to Brodie, which he says were transcripts, be accepted as the bank accounts, we are of opinion that the plaintiffs fail to prove thereby what is necessary for their case. There was no account between the bank and Brodie except with Brodie as trustee. Upon this account, these sums are credited, while a portion of the amounts debited to him are for payments, as shown by the names of the beneficiaries, for the purposes of the trust. It appears thereby that advances were sometimes made to Brodie as trustee. Such are the demand loans stated in the account, to the payment of which the trust funds, such as those derived from the sale of the real estate as above stated, were to some extent, apparently, applied. These loans, as described by Fuller, do not appear on the bank books. Memoranda or checks in such cases were made, which were held as cash, but no notes were discounted. These demand loans are in effect permissions to the depositor to overdraw, and if the trust funds, when paid in, are absorbed by these overdrafts, the demand loan is thus paid. We are not prepared to say, that permitting a trustee to overdraw, and then to pay the overdraft by the proceeds of trust property which he has a right to sell, necessarily makes the bank responsible for the money thus overdrawn, if it be misused by the trustee. Had the trustee sold the real estate, which he had authority to do, and deposited the proceeds with the bank, there being no balance against him, and had he then drawn out the money and devoted it to his own use, the bank would certainly not be responsible.

It is not shown, in regard to the bank account, that any advances were made to Brodie, trustee, under such circumstances that the bank was fairly put upon inquiry whether they were or were not to be used for other purposes than those of the trust, and thus that it should be made responsible for the fraud committed by him on the estate.

In these respects the transaction differs from those as to the bonds and the stocks, which were carried on by means of the pledge of securities, no authority to pledge which was given to the trustee. An authority to pledge securities cannot be inferred from an authority to sell the same and reinvest the proceeds. The transaction as to the bonds commenced by a proposition on the part of the trustee for a private loan, which was met by a counter proposition that these bonds should be used as collateral security, and which was continued by the pledge of bonds which the trustee had no right to use for such purpose, and which it must be inferred that the bank knew, or should have known, he had no right so to use. The transaction as to the stocks, not only put the bank upon inquiry as to whether the trustee had any right to pledge the stocks of the trust under any circumstances, but especially whether he had any right to conduct the business he assumed to carry on thereby, which inquiry was never properly made.

*Decrees for plaintiffs accordingly.*

The case was argued at the bar in November 1881, and reargued in March 1882.

*E. D. Sohier*, for the plaintiffs.

*S. Bartlett & F. Bartlett*, for the Merchants' Bank, cited *Jones* v. *Smith*, 1 Hare, 43, 56, and 1 Phil. 244, 253 ; *Le Neve* v. *Le Neve*, 1 Ambl. 436 ; *Ware* v. *Egmont*, 4 DeG., M. & G. 460 ; *Wyllie* v. *Pollen*, 32 L. J. (N. S.) Ch. 782 ; 2 White & Tudor Lead. Cas. in Eq. (4 Am. ed.) 177, 178 ; *Cave* v. *Cave*, 15 Ch. D. 639 ; *Kennedy* v. *Green*, 3 Myl. & K. 699 ; *Sharpe* v. *Foy*, L. R. 4 Ch. 35, 40 ; *Merchants' Bank* v. *State Bank*, 10 Wall. 604 ; *Calais Steamboat Co.* v. *Van Pelt*, 2 Black, 372, 377 ; *Mussey* v. *Beecher*, 3 Cush. 511, 516 ; *Ashton* v. *Atlantic Bank*, 3 Allen, 217 ; *New York & New Haven Railroad* v. *Schuyler*, 34 N. Y. 30, 68.