Price, J.
The Commercial Bank Company was incorporated under the laws of this state in March; 1901, and it organized by the stockholders electing five directors consisting of Leonard Orme, H. O. Barber, P. C. Patterson, William.Moss and Charles Bell. The directors promptly elected Leonard Orme, president, H. O. Barber, vice-president, William Moss, secretary, and Charles Bell-, treasurer. These directors and officers of the bank were afterwards re-elected to and occupied the same posi *343 tions respectively, until the close of the bant on the thirteenth day of June, 1904, and subsequent thereto, but the directors never held a meeting after June, 1903.
Under the regulations of the company the directors appointed said P. C. Patterson cashier and he served in that capacity until June 11, 1904. On that day “and for a long time prior thereto,” the said company “was hopelessly and irretrievably insolvent, of which fact said H. O. Barber and P. C. Patterson, officers and directors aforesaid, had full knowledge. ’ ’ Another fact agreed upon is, “that during the existence of said bank, said P. C. Patterson, as a director and by virtue of his' office as .cashier, and by the authority of said board of directors, was in control of the property of said bank, and was the active manager of its business. Leonard Orme was old and infirm, resided quite a distance from Cambridge (location of bank) and never took, nor was he, when elected president, expected to take any active part in conducting the business of said, bank.” And further, Charles Bell, treasurer, resided and was engaged in business at New Lexington, Ohio, and William Moss, the secretary, was engaged in business at Cambridge, and neither <?f them took any part in the management of the business of the bank.”
One Dwight Scott was an employe in said bank during its existence, and during ■ the last- year or longer, was, though never so designated or appointed, styled assistant cashier, and servéd the bank as teller and bookkeeper. During the last two years or more of the bank’s life Paul Keyes was employed as bookkeeper. Prior to the thirteenth day of June, 1904, the plaintiff below, Baker, had *344 been a depositor in said bank and had an account therewith which showed a balance due him of about $100.00. There had been no special arrangement with the bank concerning his- deposits to treat checks as money, or to draw against them before collected, but his custom when making deposits, was to pass his checks endorsed in blank and his money over the counter to the cashier or other person in charge, who would enter the same in plaintiff’s pass book, and then credit plaintiff’s account with the bank on its books, subject to the right of the bank to charge back any check that might be dishonored. The $99.00 in money and the two checks on other banks amounting to $184.00 referred to in the petition were deposited on the thirteenth day of June, 1904, about one-half hour before the bank closed, by handing the same to Dwight Scott, assistant cashier, together with a deposit slip, without any specific instructions, who entered the amount thereof as a credit to plaintiff in his pass book, which' was returned to him. Scott put the $99.00 cash with the money of the bank “and the same became indistinguishably mingled with the general mass of the bank’s funds then on hand, and that may have been thereafter received” on that day. No entry was made of said deposit to plaintiff’s credit on any book of the bank on that day, nor at any time by said bank, or its officers, agents and employes, but after the appointment of the receiver and at his direction on the fifteenth day of June, 1904, the amount of said deposit, cash and checks, $283.00, was entered on the ledger to plaintiff’s credit, but these checks being on other banks, were not collected by the receivers for several days thereafter. When said deposit was made by plaintiff, he had no knowledge *345 of the insolvent condition of the bank but believed it to be solvent, and when he learned of the appointment of a receiver, on the fifteenth day of June, 1904, demanded payment of him of said money and checks or the proceeds thereof aggregating $283.00, which demand was refused.
On the eleventh day of June preceding, which was Saturday, about midnight, said Barber and Patterson clandestinely absconded, but the same was neither known or suspected by any one connected with the bank until after the close of business on the thirteenth day of June, 1904, when its total funds, including the amount deposited by plaintiff, amounted to $3,026.16 which was placed in the safe and afterwards, on the fifteenth of June, taken possession of by the receiver.
Another fact agreed upon, is that “the insolvency of the bank was chiefly, if not wholly, due to said Barber and Patterson, severally, jointly, and in the names of sundry corporations with which they were respectively connected, and in violation of their duties as such officers, becoming indebted to said company on notes and for overdrafts in the aggregate of more than one hundred thousand dollars, notwithstanding, that each of them was at said time insolvent, said indebtednesses were unsecured, and yet unpaid. * * * Said doings of Barber and Patterson were not known,-to, or consented to by said board of directors, but the same and the insolvent condition of said company were by said Barber and Patterson in their personal interest, respectively, concealed from and were unknown to said board of directors.” The amount Barber and Patterson owed the bank was more than one-half its paid up capital stock.
*346 It appears also, that prior to the departure of Barber and Patterson, said Dwight Scott, assistant ■cashier, and Paul Keyes, bookkeeper, had knowledge that said “company was short of funds,” and they were informed by Barber and Patterson, or by one of them, that they were going to Cincinnati to procure funds for the bank, and would return Monday, June 13th, or Monday night, with funds for the bank. But they did not return and the bank never opened for business after, that day.
Another important, fact agreed upon is: “that an examination of the condition of. said bank at any time within thirty days before it was closed would have disclosed its insolvency, but no such examination was made by the board of directors or by any person on their behalf.”
The foregoing are the facts brought into the Tecord, and what judgment do they demand?
Ordinarily the relation between a general depositor and the bank is that of debtor and creditor, and that relation, when allowed to stand, will not authorize or permit such depositor to obtain a preference over- other general creditors in case the bank was insolvent when the deposit was made. Mere insolvency does not furnish a ground for a rescission of the transaction, but in order to prevent the title to the deposit vesting in the bank, fraud must be shown in its reception sufficient to entitle the depositor to repudiate the deposit and reclaim the same. The plaintiff claims the facts make such a case.
It is alleged in the petition and not denied in the answer, and it is also agreed upon as a fact in the case, that for a long time prior to the making of the deposit in question, the bank was “hopelessly and irretrievably insolvent.” These are remarkably *347 strong words, and they characterize the condition of the hank for a period not made definite, hut left to ns as an admonition that hopeless insolvency had existed for a “long time.”
The plaintiffs in error, the receivers, insist that although such had been the real condition of the bank for a long time, it was not known to .the board of directors and officers of the bank, other than Barber, director and vice-president, and Patterson, director and cashier; and that their transactions which involved and wrecked it, were in their own personal interest and were concealed from the board of directors. It is argued from this fact, that their knowledge cannot be imputed to the bank. In other words, they had been and were occupying a position with reference to the business of the bank, adverse to its interests, and while they were agents for the bank for some purposes, and in all things in the line of duty within,the scope of their authority, yet they did not represent it in their fraudulent appropriation of its assets. To determine the soundness of this claim we must not overlook one other fact agreed upon, “that Patterson, during the existence of the bank, as a director and by virtue of his office of cashier, and by the authority of said board of directors, was in control of the property of said bank and ivas the active manager. of its business.”
It would seem that the board of directors, in whom the law vests the general control and management of the affairs of the corporation, attempted to shift all, or at least a large portion of its authority and responsibility to the shoulders of the cashier. This is entirely consistent with the other fact, that there had been no meeting of the board within the year next preceding the failure of the bank. The *348 president was old and infirm and resided some distance from the city, the location of the bank. When he was elected it was not expected by the board that he would take any active part in conducting the affairs of the bank. Charles Bell, the treasurer, was engaged in business in another county and William Moss, the secretary, was in business of his own in Cambridge, but neither of them took any part in the management of the business of the bank. These men were also directors, as were Barber, Patterson and Orme. How was the board of directors to receive any information under such circumstances? How could it know what was going on inside of the institution except through those put and left in active charge?
If the wrongs committed by the cashier and vice-president had been confined to a single transaction, or to a few transactions within a brief period, there would be some room for the proposition made, that the bank should not be charged with their knowledge of its insolvent condition. But such was not the case. It had been hopelessly and irretrievably insolvent for “a long time” prior to the deposit involved, and the fraudulent acts of the cashier and vice-president consisted of many acts committed not at once, but during many months, perhaps years, for it is said in the agreed statement, that the “insolvency was chiefly, if not wholly, due to said Barber and Patterson severally, jointly and in the names of sundry corporations with which they were respectively connected, and in violation of their duty as such officers, becoming indebted to said company on notes and for overdrafts in the aggregate of more than one hundred thousand dollars. ’ ’ They were insolvent all this time, and the bank had no *349 security for their indebtedness. There was a protracted looting, and the cash in the. vaults shrank gradually from time to time as the fraudulent acts proceeded until the final collapse.
In cases resting on facts far more favorable to the bank, let us listen to the voice of the authorities.
In Smith v. Anderson, 10 N. Y. Supplement, 278, the plaintiff delivered monies to the president of a bank to be deposited therein and the latter without plaintiff’s knowledge or consent, deposited .them in his own name as her attorney, and afterwards unlawfully appropriated a large part thereof to his own use. It was héld that the bank is liable, since it is chárgeable with the knowledge possessed by its president. On page 279 the court say “if Warner (the president) had converted the money without the bank having received it, or without credit being given on its books, it would not be liable. But when its president receives funds which go into the bank, it is chargeable with all the knowledge possessed by him; otherwise those dealing with banks would be without remedy in case of fraud or misappropriation on the part of its president.” And on page 280, it is said: “the bank created its president, and if, through his fraud) it or a third person must suffer, the maxim protects the customer.”
In Bank v. Kellogg et al., 4 S. Da., 312, the cashier took a note payable to himself, as an individual, and transferred it to the bank of which he was cashier. It was held, that knowledge of the •cashier as to defenses and equities existing against the note, was the knowledge of the bank.
In Le Duc, Receiver, v. Moore et al., 111 N. C., 516, J had executed his promissory note to M, the *350 president of a bank, who before its maturity and for value, but for Ms own benefit, endorsed tbe note over to tbe bank. Tbe president and cashier composed tbe discount committee of tbe bank, and tbe president participated in discounting tbe note. It was held, tbat tbe bank took tbe note subject to all tbe equities by wbicb tbe president as an individual was bound, tbe presumption being tbat bis knowledge was tbe knowledge of tbe bank.
Of like import is Cattle Co. v. Foster, 41 Pac. Rep., 522. In Hardy et al. v. Bank, 56 Kan., 493, it appeared tbat tbe president and cashier respectively of a bank, were part owners of a note sued on by tbe bank, wbicb note was taken in tbe name of S by tbe procurement of tbe president and cashier, who bad full knowledge of tbe transaction in wbicb it was given. It was beld, tbat tbe endorsement of tbe note by S without recourse did not operate to transfer it to tbe bank free from defenses existing between tbe original parties to it.
The same principle is maintained in Bank v. Phillips, 64 Am. Dec., 254. In Bank of New Milford v. The Town of New Milford, 36 Conn., 93, it appears tbat C, whO'Was at tbe same time treasurer of a town and cashier of a bank, took $3,000 from tbe funds of tbe bank for bis own use and executed a note to tbe bank for tbe amount as treasurer of tbe town, the note being entered upon tbe books of tbe bank in tbe same manner with other notes taken for money loaned. ' C was tbe principal financial manager of tbe bank and bad been allowed and accustomed to make loans at Ms discretion, without consulting tbe directors. He bad already, without their knowledge, embezzled tbe funds of tbe bank to a large amount. Tbe town had been in tbe habit of borrow *351 ing money at this hank and elsewhere, and upon notes executed by the town treasurer, and these loans had been reported to the town in the annual reports of the treasurer which reports had been accepted by the town. Occasional votes of the town for thirty years had authorized the treasurers to borrow money for the use of the town. In the suit by the bank against the town on the note mentioned, it was held, (1) that the votes of the town and reports of the town treasurers, were admissible in evidence upon the question of the authority Of C to borrow money for the town. (2) That C was engaged in an extensive fraud upon the bank and in view of all the facts, it was fairly presumable that-he made the note in the form in which he did, as a false representation and cover by-which to perpetrate a fraud on the bank, and with no intention to bind the town. (3) But that if he intended to bind the town, his own fraud as treasurer was known to him as agent of the bank, and was therefore the knowledge of the bank and it could not recover.
In Loring et al. v. Brodie, 134 Mass., 453, it is held, that if a cashier of a bank receives securities on a loan from the bank to a trustee, with knowledge that the securities belong to a trust, the bank is affected with the knowledge of its cashier, and is put upon inquiry as to whether the trustee has authority to pledge the securities. In Bank v. Blake, 60 Fed. Rep., 78, it appeared that the defendant had executed his promissory note to C and delivered it upon condition that it was. to be surrendered to him upon C’s failure to perform stipulated acts. C immediately transferred the note by endorsement to a bank of which he was. *352 president and general manager. The circuit court of the United States held, that as C himself was the sole representative of the bank, in the transfer of the note to it, the bank is chargeable with his knowledge of the condition to which it was subject, and could not sue on. the note until that condition is performed.
In Bank v. Loyd et al., 89 Mo. Appeals, 262, it was held that where a bank cashier makes purchase of a certificate of stock as such cashier, he acts within the scope of his authority and the knowledge that he has of the condition of the stock must be imputed to the bank.
In Baldwin et al. v. Davis et al., 91 N. W. Rep. (Iowa), 778, it is held that where an agent of a bank has notice that notes and a mortgage securing them were without consideration and fraudulent, the bank cannot hold the notes as collateral, it being charged with the knowledge of its agent.
See also Bank v. Smith, 110 Tenn., 337, where the same doctrine is approved.
Goshorn v. Peoples National Bank, 69 N. E. Rep., 185 (Ind.), is a case where a depositor, desiring to withdraw his bank deposit and commit it to a trust company, received from the bank cashier a* suggestion as to a particular trust company, and drawing a check delivered it to the cashier, with instructions to deposit the amount named with the company suggested. Instead of doing so, the cashier substituted the depositor’s money for paid checks of his own on the bank which he was carrying as cash. It was held, that even on the theory that the cashier was the depositor’s agent for the transmission of the fund, the bank was liable for its misappropriation, the transaction amounting to a payment of the *353 depositor’s cheek merely with the evidences of the cashier’s indebtedness, and the bank being cognizant of the fraud through its cashier.
See also Cutting v. Marlor, 78 N. Y., 454, for similar holding. In that case one Bonnor was the president of the bank involved in one. of his fraudulent transactions in converting to his use certain securities delivered to the bank as collateral for a loan. The trustees of the bank left the entire management of it to Bonnor and another who was styled manager. The trustees took the statement of Bonnor without question or examination. The bank was chargeable with knowledge of Bonnor’s fraud.. On page 460, the court say: “A corporation is represented by its trustees and managers; their acts are its acts, and their neglect its neglect. The employment of agents of good character does not discharge their whole duty. It is misconduct not. to do this. The bank might not be liable■ for a. single act of fraud or ,crime on the part of an officer \ or agent, while it would be for a continuous course of fraudulent practice, especially those so openly committed and easily detected as these are' shown to have been. Here were no supervision, no meetings, no examination, no inquiry * *
See also Bank v. Bank, 10 Gray, 532; Savings Institution v. Bostwick, 19 Hun, 354; Holden v. Bank, 72 N. Y., 286.
In Martin v. Webb, 110 U. S., 7-15, it was held that knowledge of the president of a bank is its knowledge. In Cragie v. Hadley, 99 N. Y., 131, the court held that the acceptance of a deposit by a bank irretrievably insolvent, constituted such a fraud as entitled a depositor to reclaim his drafts or their proceeds.
*354 Indeed there are peculiar and urgent reasons for a more stringent enforcement of the rule against corporations than against individual principals, from the fact that the only way of communicating actual notice to a corporation is through its agents. Bank v. New York, etc., Canal Co., 4 Paige’s Ch. 127: “A corporation cannot see or know anything except by the eyes and intelligence of its officers. ’ ’
There are many other cases in the same channel, but we have cited enough for the present purpose. It is quite true that cases can be found that seem .to hold to a doctrine contrary to the foregoing, but they rest on a different character of facts, and usually treat of a single transaction wherein the fraudulent act of the officer or agent of the bank did not bind it. But as before stated, the conduct and acts of Barber and Patterson were of a series, running doubtless through many months; obtaining bank funds on their own worthless notes and on overdrafts from time to time so that the bank became “hopelessly and irretrievably insolvent” and this condition existed for a long time prior to the- making of the deposit in question.
What then, is the application of the law as we understand it'to the facts of this case? The officers named, of course knew the bank was insolvent, and under the circumstances surrounding them, their knowledge was the knowledge of the bank. The board of directors created the cashier and vested in him the broad powers described in the above agreed statement. Not only so, but they seem to have abandoned all supervision and -control during the last year of its active existence — abandoned it to whatever fate might overtake it in charge of such *355 officers. The bank did not become insolvent after Barber and Patterson absconded on the night of June 11th, for it had been insolvent a long time prior thereto, and hopelessly so. Through them the bank knew it. The board of directors is -chargeable with such knowledge of its condition as would have been ascertained by the exercise of ordinary care.
. Nevertheless its doors were again opened,on Monday, June 13th, which fact was an invitation to make a deposit when none should have been received.'. It was a palpable fraud on any innocent depositor to receive his money on that day — such fraud as should vitiate the transaction as a deposit and prevent title from vesting in the bank. In our judgment, no title did pass to the bank in this instance. •
, . It seems useless to say that Barber and Patterson having absconded on the previous; Saturday night, did not represent the bank on the thirteenth. ■. True, they left it, but they left it as a mere shell. Scott who acted as assistant cashier and bookkeeper-,' and Keyes as bookkeeper were in charge on the .thirteenth. They knew the bank was short of funds so-that with what was taken in on that day, there was; but little over $3,000 in its coffers. They were the only persons on duty there, and they knew that if the departing officers did not return with ample,-means, by Monday night, the bank could not open again.. They did not return and as soon as the depositor learned that the bank was closed, he demanded of the receivers, the return of his deposit. -We think he had a right of rescission' and that the receivers held his deposit impressed with a trust to return it. :
*356 However, it is urged that the money deposited was indistinguishably mingled with the other funds of thé bank, and that before a trust can attach, the depositor must be able to trace and identify his particular deposit. As a general rule this is true, but not always so. In this, case there is not much difficulty in applying the rule, for it is agreed, that, although the cash deposited was placed and commingled with other cash on hand the evening of the deposit, it was not credited to Barber on the books of the bank until after the appointment of the receiver, and it was done under his direction. As to the checks on other banks which were part of the deposit, they were not collected by the bank but by the receiver and several days after the appointment. "While there were no “ear marks” on the money, the exact amount so deposited was known, and we regard the identification sufficient under the rules adopted by' the courts to govern in such circumstances. In Richardson v. New Orleans Debenture Co., 102 Fed. Rep., 780, the circuit court of appeals, held: (1) “that when a bank receives a deposit after hopelessly insolvent, the fraud avoids the implied contract between the parties by which the relation of debtor and creditor would ordinarily arise, and prevents the money deposited from becoming the property of the bank, and a trust is the equitable result. ’ ’ (2) “Where a bank receives a deposit on the day of its suspension when it is known by its officers to be insolvent, and mingles the money with its own funds which, to an amount larger than the deposit pass into the hands of a receiver, it is not essential to the right of the depositor to recover his deposit from the receiver, that he should be able to trace the identical money deposited into the receiver’s hands, but *357 it is sufficient that the amount which went into his hands was increased by the amount of the deposit.”
In Massey et al. v. Fisher, 62 Fed. Rep., 958, the circuit court for eastern district of Pennsylvania laid down the following rule: “The fact that the money was not marked and by a commingling with other funds of the bank, lost its identity, does not affect the right to recover in full, if it can be traced to the vaults of the bank, and it appears that a sum equivalent to it remained continuously therein until removed by the receiver.” That court, in the opinion cites many supporting cases.
In Wasson v. Hawkins, 59 Fed. Rep., 233, the circuit court held that “where money and checks are unsuspectingly deposited in a bank, which is known by its managing officer to be hopelessly insolvent, a few minutes before the closing hour on the last day on which it does business, and the checks are subsequently collected by the bank’s clerk, the whole of the deposit is charged with a trust, and an equal amount may be recovered from the receiver, who retains the specific money among the general mass of the bank’s funds.”
In Beal, Receiver, v. City of Somerville, 50. Fed. Rep., 647, the circuit court of appeals, first circuit, laid down the following proposition: “A city treasurer deposited checks in a bank, endorsed by him ‘for deposit,’ and the checks were immediately credited to him on his bank book, though not in pursuance of any agreement to that effect. He had been a depositor in the bank for some years, but had no agreement that his checks should be treated as cash, or that he should draw against them before collection. The bank became insolvent before the cheeks were collected, and their proceeds passed into the. *358 hands of.'a receiver. ' Held, that no title passed’to the bank , except as a bailee, and that the depositor was entitled to the proceeds. ”
Of like- import is City of Philadelphia v. Aldrich, 98 Fed. Rep., 487. The foregoing decisions on this subject are quite within the case of St. Louis, etc., Railway Co. v. Johnston, 133 U. S., 566, where it is decided, that “when a bank has become hopelessly insolvent, and its president knows it is so, it is a fraud to réceive deposits of checks from innocent depositors, ignorant of its condition, and he can reclaim them or their proceeds.” Further discussion and citation of authorities seem to be unnecessary. We believe there is no error in the judgment of the lower court and it is affirmed. But in rendering this judgment, we are not laying down general rules to be applied indiscriminately, but wish to limit our decisión and its scope to the facts of this case, on which alone it is authority.

Judgment affirmed.

Shauck, C. J., Crew, Summers and Spear, JJ., Goncur.
Davis, J., dissents.